**PUBLISH**

**UNITED STATES COURT OF APPEALS**

Filed 11/13/96

**TENTH CIRCUIT**

---

ANNE GARDETTO,

       Plaintiff - Appellant,

    v.

ROY MASON, Individually, and in his official capacity, and EASTERN WYOMING COLLEGE,

       Defendants - Appellees.

No. 95-8005

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D. Ct. No. 93-CV-328)**

---

Jeremiah A. Collins, Bredhoff & Kaiser, Washington, DC (Leon Dayan, Bredhoff & Kaiser, Washington, DC and Patrick E. Hacker, Cheyenne, WY, with him on the briefs), appearing for the Appellant.

Alan Epstein, Hall & Evans, Denver, CO (Mayo Sommermeyer, Kent N. Campbell, Troy A. Ukasick, Sommermeyer, Wick, Dow & Campbell, with him on the brief), appearing for the Appellees.

---

Before PORFILIO, ANDERSON, and TACHA, Circuit Judges.

---

TACHA, Circuit Judge.

---

    Ann Gardetto bought this suit against her former employer, Eastern

Wyoming College ("EWC"), and EWC's former president, Roy Mason, after they demoted and suspended her. Gardetto claims that EWC and Mason violated her First Amendment rights of free speech and free association by retaliating against her for criticizing the policies of Mason and EWC. In addition to her federal claims, she brought two claims under Wyoming common law: one against Mason for defamation and the second against EWC for breach of its duty of good faith and fair dealing.

A jury returned a verdict for the defendants on Gardetto's First Amendment claims and her breach of the duty of good faith and fair dealing claim. With regard to the defamation claim, the jury returned a verdict in Gardetto's favor on the issue of liability but found that Gardetto had failed to prove any damages resulting from the defamation.

Gardetto moved for a new trial and alternatively for an entry of judgment notwithstanding the verdict. The district court denied both motions. Gardetto now appeals on two grounds. First, Gardetto claims that the district court committed reversible error by submitting the question of whether her speech was entitled to First Amendment protection to the jury rather than deciding the issue as a matter of law. Second, Gardetto contends that the court abused its discretion in admitting evidence regarding her rude and abusive behavior allegedly unrelated to her suspension and demotion. We exercise jurisdiction pursuant to 28 U.S.C.

§ 1291. Because we reverse and remand for a new trial on the plaintiff's First Amendment free speech claim, we need not address the plaintiff's evidentiary ground for appeal.

## BACKGROUND

In 1974, Gardetto began working for EWC as the college's Minority and Community Counselor. EWC eventually promoted Gardetto to the position of Director of Nontraditional Student Services/Special Services. In that capacity, Gardetto was responsible for developing programs designed to support and provide guidance to adult students. She also supervised four staff members and twelve peer counselors at the college's Adult Reentry Center ("ARC").

In 1990, Roy Mason became president of EWC. Although Mason initially praised Gardetto's work, his view of Gardetto changed markedly when she began to speak out on matters relating to the educational policies and practices of the college. Gardetto asserts that as a result of her criticisms, the defendants retaliated against her in violation of her First Amendment rights. Specifically, Gardetto identifies six speech incidents which allegedly resulted in her demotion and suspension: (1) her criticism of the college's proposed reduction-in-force procedures at the college's board of trustees meeting, (2) her opposition to the application of those procedures to terminate a fellow ARC employee and eliminate that employee's position, (3) her support for a vote of "no confidence"

in Mason by a local faculty association, (4) her criticism of Mason for holding himself out as a "doctor" when he did not have a doctoral degree, (5) her campaign support of three non-incumbent candidates vying for a position on the college's board of trustees, and (6) her criticism of the reorganization of the ARC to a visitor giving a speech at the college. We will briefly describe each of these expressive incidents.[1]

Gardetto first began criticizing Mason and EWC in December 1991 when the EWC board of trustees directed Mason to develop a reduction-in-force procedure for the college. In the spring of 1992, Gardetto, who previously had served on a finance committee responsible for drafting the college's reduction-in-force procedures, attended two open board of trustees meetings held to consider Mason's new proposed procedures. At the meetings, Gardetto, as well as other EWC faculty members, criticized the proposed procedures because they contemplated a reduction-in-force absent any finding of fiscal exigency and

---

[1]We note that the record is replete with incidents describing Gardetto's general criticism of Mason, EWC, and the college's administration. For example, Gardetto testified that she complained to Bill Guth, EWC's chairman of the board, that Chuck Engbretson, EWC's vice-president, had divested her of her administrative responsibility over particular adult reentry and low-income programs. In that conversation, Gardetto also expressed concern about the impact of weakening EWC's adult support programs on the accessibility of higher education to adults and low-income groups.

We emphasize that Gardetto relies upon only these six specific incidents of expression as the basis of her First Amendment free speech claim. Thus, we will not address any of the numerous other instances of Gardetto's expression in the record.

because they failed to use objective criteria (such as seniority or tenure) to determine which personnel should be terminated. Gardetto and others expressed their view that a reduction-in-force should be undertaken only after other cost-cutting measures failed to resolve the budget shortfall.

The second incident involving Gardetto's First Amendment claim occurred in April 1992. At that time, Gardetto learned that Mason proposed to terminate Mary McBroom, an employee who worked in the ARC, and to eliminate McBroom's position as part of the reduction-in-force plan. Gardetto privately voiced her opposition to Mason's treatment of McBroom and her position, stating that McBroom's services were critical to the success of the program and that if a cut were truly necessary, Mason should eliminate a secretarial position in his own office. During a second meeting between Mason and Gardetto about McBroom's position, Gardetto became agitated and yelled at him. She threatened Mason, stating that if he did anything to harm the ARC, she would destroy him personally and professionally. When Mason attempted to end the conversation, Gardetto followed him down a hallway and continued to yell at him.

In addition to her private conversations with Mason about McBroom's position, Gardetto criticized Mason's decision to terminate McBroom during an EWC reduction-in-force grievance committee meeting. Although the committee expressed concern about the decision in its report to the board of trustees, the

board nevertheless approved Mason's proposal to terminate Mary McBroom and eliminate her position. EWC eventually rehired McBroom in a grant-funded position that became available. The board's handling of McBroom and other personnel reductions, however, sparked a great deal of controversy throughout the college and the community. A regional radio station interviewed Mason about the termination and rehiring of McBroom, and a local newspaper ran a series of stories on the decision.

The third incident that forms the basis of Gardetto's First Amendment claim occurred around the same time as the McBroom debate. Gardetto had become concerned with Mason's ability to administer the college. Accordingly, she proposed that the Eastern Wyoming Higher Educational Professional Association render an advisory vote of "no confidence" in Mason. Although the motion failed in May 1992, it passed in April 1993.

The fourth event relevant to Gardetto's free speech claim occurred in the summer of 1992 when Gardetto discovered that although Mason allowed others to refer to him as "Dr." Mason and wore distinctive doctoral robes at graduation ceremonies, Mason did not have a doctoral degree. Gardetto spoke to a reporter at a local newspaper about the matter. She told the reporter that Mason's misrepresentation was an "egregious act" and "that in the world of academia, this centers around issues of honesty and integrity." The newspaper reported the story

in September 1992.

The fifth event that Gardetto argues gives rise to her First Amendment claim occurred in the fall of 1992. Gardetto publicly supported the election of three non-incumbents who were vying for a position on the college's seven-member board of trustees. Gardetto also served as the campaign treasurer for one of the challengers. After all three challengers won, Mason sent a confidential letter to the lame-duck board indicating that he wanted either to suspend or terminate Gardetto. Mason told the board that "given the history and recent election results, I would like your counsel before I take action." In response, the board requested that Mason not take any adverse action due to the sensitive nature of the matter.

On April 13, 1993, Mason demoted Gardetto to the position of Special Populations Counselor, a position similar to her first job with the EWC, Minority Community Counselor. One day later, Mason gave her the title of Recruitment and Retention Specialist, but her status as a counselor without any staff remained the same.

The final event relevant to Gardetto's free speech claim occurred on May 25, 1993, when EWC hosted a statewide Student Services Conference. The keynote speaker, Dr. Tom Gonzales, was introduced to Gardetto after his speech. She took the opportunity to give Gonzales a tour of the ARC and to praise the

center's achievements. Shortly after Mason observed Gardetto with Gonzales, Mason summoned Billy Bates, Gardetto's direct supervisor, to his office. Mason was very angry and told Bates that he was going to suspend Anne Gardetto for insubordination. Bates thought that this "Gonzalez incident" precipitated Mason's plans to suspend Gardetto.

On May 28, 1993, Mason suspended Gardetto with pay for the remainder of the academic year and removed her from her current position at EWC. Gardetto brought this suit against Mason and EWC, and the case proceeded to trial.

At the close of the evidence, the district court gave the following instruction to the jury:

Jury Instruction No. 9

> If you find that the plaintiff carried her burden of proving that her speech, her associations or both, were a substantial or a motivating factor in the defendants' decision to suspend her, then you must next determine whether the defendants have proven to you by a preponderance of the evidence that the plaintiff would have been suspended from her employment even if her free speech and/or associational activities had not been considered based on defendants' allegations of insubordination, violation of the policies of EWC or interference with the orderly administration of the College.
>
> You are instructed that government entities such as EWC are charged by law with fulfilling particular tasks. These entities in turn hire individuals to assist them in achieving their mission as efficiently and effectively as possible. When government employees say or do things that may impede the entities' [sic] ability to carry out its mission, then the government employer may be entitled to restrain the employee.

> Whether or not the plaintiff's association or speech detracted from EWC's ability to perform its mission effectively and whether or not the defendants justifiably or appropriately restricted the plaintiff's First Amendment rights is a matter within your province to determine based on all of the evidence and the circumstances presented therein. It is the defendants' burden to prove, by a preponderance of the evidence, that the plaintiff would have been suspended in any event notwithstanding her First Amendment rights.

(Emphasis added). Both parties objected to this instruction at trial. Gardetto argued that the form of the instruction effectively allowed the jury to decide the legal issue of whether the speech at issue in this case was constitutionally protected. Mason and EWC, on the other hand, argued that the instruction should not be given at all because the trial court should have determined, as a matter of law, that Gardetto's speech was not protected by the First Amendment.

The district court also submitted a special verdict interrogatories to the jury. Special Interrogatory 1 stated:

> 1(a). Do you find, by a preponderance of the evidence, that the plaintiff's protected speech was a motivating factor in the defendant or defendants' decision to take adverse action against her?
> Roy Mason      YES __  NO __
> Eastern Wyoming College YES __  NO __
>
> As to any defendants whom you answered "YES," please proceed to question 1(b). As to any defendants whom you answered "NO," please proceed to question 2(a).
>
> 1(b). Do you find, by a preponderance of the evidence, that the defendant or defendants proved that it or they would have reached the same decision in the absence of the plaintiff's protected speech?

Roy Mason                     YES __     NO __
Eastern Wyoming College       YES __     NO __

Special Interrogatory 2 asked the same questions, but substituted the phrase "protected associations" for "protected speech."

The jury returned a verdict for Mason and EWC on both First Amendment claims. The jury answered "No" to Special Interrogatories 1(a) and 2(a). As directed by the interrogatories, the jury did not answer Special Interrogatories 1(b) and 2(b).

Gardetto moved for a new trial and alternatively for an entry of judgment notwithstanding the verdict, renewing her argument that Jury Instruction No. 9 impermissibly allowed the jury to consider the legal issue of whether Gardetto's speech was constitutionally protected. The district court denied the motion, reasoning that the issue was rendered moot by the jury's response to Special Interrogatories 1(a) and 2(a). The court found that the possibility that the jury engaged in an improper balancing of the parties' rights was highly unlikely because of the structure of the special interrogatories and the sequential steps described in Jury Instruction No. 9.

On appeal, Gardetto again maintains that the language in Jury Instruction No. 9 improperly invited the jury to balance her First Amendment rights against EWC's interest in providing effective and efficient service to the public, a

question of law which the district court should have resolved. The defendants contend that whether the district court properly instructed the jury is irrelevant because Gardetto's speech is not protected by the First Amendment as a matter of law. Alternatively, the defendants contend that, even if Gardetto's speech is protected, the district court's instructions and interrogatories, taken as a whole, did not allow the jury to decide an issue outside its province.

**DISCUSSION**

In reviewing a public employee's First Amendment retaliation claim, we apply the four-step test derived from Pickering v. Board of Education, 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983). Melton v. City of Oklahoma City, 879 F.2d 706, 713 (10th Cir. 1989), modified on other grounds, 928 F.2d 920 (10th Cir.) (en banc), cert. denied, 502 U.S. 906 (1991). First, the court must determine whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." Connick, 461 U.S. at 146. If so, the court must then proceed to the second step and balance the employee's interest, as a citizen, in commenting upon matters of public concern against "the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." Pickering, 391 U.S. at 568. Assuming that the Pickering balancing test tips in favor of the employee, the

employee, under the third step, must prove that the protected speech was a substantial factor or a motivating factor in the detrimental employment decision. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Melton, 879 F.2d at 713, 716. Finally, if the employee makes this showing, the burden then shifts to the employer to show "by a preponderance of evidence that it would have reached the same decision . . . even in the absence of the protected conduct." Mt. Healthy, 429 U.S. at 287. Steps one and two concern whether the expression at issue is subject to the protection of the First Amendment. Thus, they present legal questions to be resolved by the court. In contrast, the third and fourth steps concern causation and involve questions of fact to be resolved by the jury. Melton, 879 F.2d at 713.

## I.     First Amendment Protection of Gardetto's Expression

Mason and EWC urge the court to affirm the judgment of the district court regardless of any error in the jury instructions because none of Gardetto's speech was protected by the First Amendment as a matter of law. Thus, the defendants argue that the case should never have been submitted to the jury. We consider this argument on appeal because "application of the Pickering balancing test is a question of law, properly reviewable de novo by this court." Koch v. City of Hutchinson, 847 F.2d 1436, 1441 n.14 (10th Cir.) (en banc), cert. denied, 488 U.S. 909 (1988); Melton, 879 F.2d at 713. Moreover, we may affirm the decision

of the district court on any basis revealed by the record. Koch, 847 F.2d at 1441 n.14 (citations omitted).

## A. Public Concern

The threshold question in assessing the free speech claim of a discharged, demoted, or suspended government employee is whether the employee has spoken "as a citizen upon matters of public concern" or merely "as an employee upon matters only of personal interest." Connick, 461 U.S. at 147. Speech regarding matters of mere personal interest are not subject to protection under the First Amendment. Thus, where an employee's speech cannot be characterized as speech on a matter of public concern, it is unnecessary for the court to examine the reasons for her discharge, demotion, or suspension. Id. at 146. In making this determination, we must consider the "content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. Matters of public concern are those which can "be fairly considered as relating to any matter of political, social, or other concern to the community." Id. at 146. While speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern, id. at 148, "[s]peech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests." Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988).

In deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. Id. That is, we must evaluate whether Gardetto spoke out based on the same motivation that would move the public to speak out. Applying these standards to each of the six incidents of speech at issue in this case, we hold that all but two (Gardetto's criticism of McBroom's termination and Gardetto's conversation with Gonzales) involve matters of public concern.

The speech incident that most obviously involves a matter of public concern is Gardetto's public support of the three non-incumbent candidates for positions on EWC's board of trustees. One of the primary functions of a college's board of trustees is to determine the extent and type of educational services available to the public; the board is not a committee charged merely with the administration of internal affairs. Moreover, the advocacy of a particular candidate for public office is the type of core political speech the First Amendment was designed to protect. Buckley v. Valeo, 424 U.S. 1, 14-15 (1976) ("[I]t can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."). In the spectrum of expression protected by the First Amendment, we place great value upon political speech in the electoral process. See Kinsey v.

Salado Indep. Sch. Dist., 950 F.2d 988, 995 (5th Cir.) (holding that when a superintendent who opposed the winning slate in a school board election was terminated, "his speech and association involved matters of great public concern--the performance of elected officials"), cert. denied, 504 U.S. 941 (1992). Thus, we hold that Gardetto's endorsement of the three insurgent candidates for the college's board positions involves speech on a matter of public concern.

Similarly, we hold that Gardetto's statements criticizing Mason for holding himself out as a "doctor" when he did not have a Ph.D. or other doctoral degree involves speech on a matter of public concern. The integrity, qualifications, and misrepresentations of a highly visible public official, such as the president of a college, obviously impact the social and political life of a community. See Patrick v. Miller, 953 F.2d 1240, 1246-47 (10th Cir. 1992) (holding that a city finance director's allegations of discriminatory employment practices in support of black females and perceived illegal budgeting activities were matters of public concern); Conaway, 853 F.2d at 796-97 (holding that a city electrical inspector's comments complaining of work performed for city officials and their friends on city time, illegal payoffs, and incidents of released substandard electrical work constituted expression on matters of public concern); Wren v. Spurlock, 798 F.2d 1313, 1316-18 (10th Cir. 1986), cert. denied, 479 U.S. 1085 (1987) (holding that

a teacher's accusations of sexual harassment and poor job performance by a principal involved matters of public concern).

By the same token, Gardetto's efforts to obtain a vote of "no confidence" in Mason from a local faculty association also pertain to a matter of public concern. In so holding, we rely on the Supreme Court's decision in Connick. In that case, the plaintiff was an assistant district attorney who had opposed her transfer to a different section of the criminal court. Connick, 461 U.S. at 140. The night that her transfer was finalized, she prepared a questionnaire soliciting the views of her fellow staff members concerning the office transfer policy, office morale, the need for a grievance committee, and the level of confidence in her supervisors. Id. at 141. In holding that none of these topics addressed matters of public concern, the Court emphasized that the questions, including her attempt to get a vote of "no confidence" in her supervisors, were simply "mere extensions of [her] dispute over her transfer." Id. at 148, 152. The Court stressed that the attorney was not seeking to inform the public that her superiors were not discharging their governmental responsibilities; nor was she seeking to bring to light actual or potential wrongdoing. Id. In contrast to the plaintiff in Connick, Gardetto was legitimately concerned with Mason's job performance and his wrongdoing. As the district court pointed out in its order denying summary judgment, Gardetto's expression to the association implicated broader concerns about Mason's possible

misrepresentation of his educational status, his lack of integrity and leadership, and the corresponding decline in student enrollment at EWC. Gardetto, 854 F. Supp. at 1537. The performance and integrity of a highly visible public official, such as Mason, are unquestionably issues affecting the social and political concerns of a community. Thus, we hold that Gardetto's advocacy to obtain a vote of "no confidence" in Mason from a local faculty association is a matter of public concern.

We are presented with a closer question as to whether the remaining three incidents of expression constitute matters of public concern. Gardetto's general criticisms of Mason's reduction-in-force plan, her opposition to the elimination of McBroom's position at the ARC, and her private statements to Gonzales all touch on the applications and consequences of EWC's reduction-in-force plan. Gardetto's motivation in making these statements consisted, in part, of her concern about the deterioration of various public services provided to adults by the college. Her expression, however, was also motivated by her personal interest in maintaining her position and responsibility at the ARC.

The objectives, purposes, and mission of a public university are undoubtedly matters of public concern. Moreover, in general, "speech about the use of public funds touches upon a matter of public concern." Kincade v. City of Blue Springs, 64 F.3d 389, 396 (8th Cir. 1995), cert. denied, 116 S. Ct. 1565

(1996).  Thus, the dismissal of a high school teacher for criticizing a board of education's allocation of school funds between athletics and education violates the First Amendment.  Pickering, 391 U.S. at 571-72.  Similarly, complaints about the proposed closing of a branch of a university or its spending priorities, when these decisions affect the basic functions and missions of the university, also constitute speech on matters of public concern.  See Kurtz v. Vickrey, 855 F.2d 723, 730 (11th Cir. 1988).  In contrast, the First Amendment protects neither public employee "criticisms of internal management decisions," Kurtz, 855 F.2d at 730, nor public employee complaints about the structure of purely internal administrative bodies.  Bunger v. University of Okla. Bd. of Regents, 95 F.3d 987, 992 (10th Cir. 1996).  Likewise, the details of internal budgetary allocations at an institution of public education are not matters of public concern.  Management practices or decisions allocating management responsibility to particular individuals also do not involve matters of public concern.

With these parameters in mind, we turn to the three remaining incidents of expression at issue in this case.  We hold that Gardetto's specific criticism of EWC's reduction-in-force plan to the board of trustees is a matter of public concern.  Gardetto was one of a handful of other faculty members who expressed concern about the lack of objectivity in the proposed RIF procedures in a public forum convened primarily to consider those procedures.  She also made her

criticisms nearly a month before she learned that her office would be affected by the RIF through the elimination of McBroom's position. Thus, although Gardetto could have been motivated partially by her desire to keep her job or her staff, the record reveals she was primarily motivated by a desire that a reduction-in-force be conducted only if necessary and using objective criteria.

Although the timing of a reduction-in-force and the particular reductions that result are matters of internal administration, the necessity of implementing a reduction-in-force and the fear of overly subjective reduction-in-force procedures are matters of legitimate public concern under the facts of this case. The speech of persons able to offer a well-informed perspective on expenditures of public funds may be especially valuable to public debate on such subjects. See Pickering, 391 U.S. at 572 (noting that teachers will most likely have informed and definite opinions on how a school's funds should be spent). Given that Gardetto previously served on a committee responsible for determining the college's reduction-in-force procedures and that she and other faculty members made their statements at a board of trustees meeting open to the public, the content, form, and context of Gardetto's speech indicates that her expression constitutes a matter of public concern.

In contrast, the decision to terminate McBroom and eliminate her position constitute a matter of internal administration and not a matter of public concern.

While the college's general reduction-in-force procedures are a matter of public concern, Gardetto's criticism of EWC's specific application of those procedures to her own staff hardly affects the social or political life of the community. Gardetto, in opposing this decision, was primarily motivated by her personal interest in maintaining her staff at the ARC and her relationship with McBroom. In essence, Gardetto's "grievances involved only matters of internal departmental affairs and personal interest, and thus [her] expression . . . was not protected by the First Amendment." Hom v. Squire, 81 F.3d 969, 974 (10th Cir. 1996).

Subsequent media coverage of the McBroom episode does not change our analysis. The "controversial character of a statement is irrelevant to the question [of] whether it deals with a matter of public concern," Rankin v. McPherson, 483 U.S. 378, 387 (1987), because the focus is on the motive of the speaker. McEvoy v. Shoemaker, 882 F.2d 463, 466 (10th Cir. 1989). Moreover, the record indicates that newspaper and radio coverage began only when McBroom was rehired and placed in a grant-funded position. The press was concerned about why the college now had the money to fund McBroom's position when EWC did not have the money two months before. In Gardetto's First Amendment claim, however, her speech centers on the college's initial decision to terminate McBroom, a decision which received little, if any, publicity. Thus, we hold that Gardetto's opposition to the termination of McBroom and the elimination of her

position does not involve a matter of pubic concern. To hold otherwise would transform the federal courts into "a roundtable for employee complaints over internal office affairs." Connick, 461 U.S. at 149.

Lastly, we hold that Gardetto's private expression to Gonzales is not a matter of public concern. We note that private communications on matters of public interest are entitled to First Amendment protection; an employee need not remonstrate publicly to bring his comments under the aegis of the First Amendment. Conaway, 853 F.2d at 797. See also Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 414-16 (1979) (teacher's criticisms of school policies voiced privately to principal are protected by First Amendment); Rankin, 483 U.S. at 389-92 (county clerical employee's private comments to a coworker are protected by First Amendment). Private communications are often the most effective way to bring about policy changes and the least disruptive to the delivery of government services. Therefore, the fact that Gardetto's statements to Gonzales were private does not necessarily deprive them of their protected status. Nevertheless, the content of Gardetto's expression does not involve a matter of public concern. Although the details about the content of their conversation is not clear, the record indicates that Gardetto merely shared some strategies to increase adult and minority enrollment. Gardetto's discussion of these techniques with Gonzales clearly does not implicate the political or social concerns of the

community. Thus, we hold that Gardetto's statements about EWC's methods used to increase adult and minority enrollment does not constitute a matter of public concern.

Contrary to Gardetto's assertions on appeal, Gardetto nowhere testified that she voiced her disagreement with the college's plans to reorganize the ARC to Gonzales. Regardless, such a criticism would not involve a matter of public concern. While the allocation of school funds in a manner that impacts the ultimate mission and purpose of a university constitutes a matter of public concern, see Pickering, 391 U.S at 571-72, EWC's decision to reorganize the ARC is an internal budgetary decision that does not affect the primary mission of the college. Moreover, in criticizing the effective dismantling of the ARC, Gardetto was likely motivated by her personal interest in maintaining a need for her services at the college rather than any interest that EWC may have in attracting and supporting adult students. Thus, we hold that Gardetto's statements criticizing the reorganization of the ARC, if any, would not involve matters of public concern.

In sum, we hold that four of the speech incidents at issue in this case involve matters of public concern. We therefore proceed to the second step of the Pickering/Connick analysis on these remaining speech incidents.

**B. Pickering Balancing Test**

Once a court determines that the plaintiff's speech involves a matter of public concern, the Pickering balancing test requires a court to weigh "the interest of a public employee in commenting on such matters [against] the interest of the employer in promoting the efficiency of its services." Ware v. Unified Sch. Dist. No. 492, 881 F.2d 906, 910 (10th Cir. 1989), modified in part, 902 F.2d 815 (1990). In performing this balancing, the court should not consider the statement in a vacuum; the manner, time, and place of the employee's expression are relevant, as well as the context in which the statement arose. Connick, 461 U.S. at 152-53.

Under the Pickering balancing test, the employee's First Amendment free speech rights are protected "'unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.'" Wren, 798 F.2d at 1318 (quoting Childers v. Independent Sch. Dist. No. 1, 676 F.2d 1338, 1341 (10th Cir. 1982)). Relevant considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin, 483 U.S. at 388. The government, however, cannot rely on purely speculative allegations that certain statements caused or will cause

disruption to justify the regulation of employee speech.  Wulf v. City of Wichita, 883 F.2d 842, 862 (10th Cir. 1989).  Furthermore, the government's concerns about the impact of speech must be reasonable and formed in good faith.  Waters v. Churchill, 114 S. Ct. 1878, 1889 (1994).

A careful review of the record indicates that the defendants failed to introduce any evidence of actual disruption to EWC's services arising from the remaining four speech incidents at issue in this case.  Mason testified at trial that he did not suspend or demote Gardetto because of any actual or perceived worry about disruption caused by her speech.  Under these circumstances, we have difficulty giving credence to the defendants' argument on appeal that Gardetto's speech was so disruptive that it justified her termination.  Ware, 881 F.2d at 910; see also Rankin, 483 U.S. 389 (noting that when the defendant testified that "the possibility of interference with the functions of the Constable's office had not been a consideration in his discharge of [the plaintiff]," the plaintiff's speech was not so disruptive as to be unprotected).  Although the defendants presented a great deal of evidence relating to episodes of rude and inappropriate conduct that may have interfered with the efficiency of EWC's operations, none of the episodes involved the four remaining speech incidents at issue in this case.[2]

---

[2]Of course, the jury may find such evidence relevant in determining whether the defendants would have reached the same decision in the absence of the protected speech.

Thus, under the Pickering/Connick analysis, we conclude that these speech incidents are protected by the First Amendment.

## II.     Sufficiency of the Jury Instructions

Gardetto argues that the district court committed reversible error by instructing the jury to determine the legal question of whether her speech was entitled to First Amendment protection.  We review de novo whether a district court's jury instructions, considered as a whole, properly stated the applicable law and directed the jury to consider matters within its province.  United States v. Lee, 54 F.3d 1534, 1536 (10th Cir.), cert. denied, 116 S. Ct. 247 (1995).  "'[W]e consider all the jury heard, and from the standpoint of the jury, decide not whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues.'"  Considine v. Newspaper Agency Corp., 43 F.3d 1349, 1365 (10th Cir. 1994) (quoting Resolution Trust Corp. v. Stone, 998 F.2d 1534, 1549 (10th Cir. 1993)).

In challenging the jury instructions, Gardetto specifically points to the language in Instruction No. 9 which informs the jury that "whether or not the defendants justifiably or appropriately restricted the plaintiff's First Amendment rights is a matter within your province to determine."  (Emphasis added). Gardetto contends that this instruction improperly delegated the balancing of

interests in step two of the <u>Pickering/Connick</u> inquiry to the jury. Mason and

EWC argue that the combination of Instruction No. 9 with other jury instructions[3]

limited the jury's deliberations to speech protected by the First Amendment.

Thus, because these instructions defined all of Gardetto's speech as protected, the

defendants assert that Instruction No. 9 directed the jury to determine only

whether Gardetto's speech was a motivating factor in her suspension.

We conclude that, viewed as a whole, the jury instructions conveyed the

message that not all speech by government employees is entitled to First

Amendment protection and then invited the jury to determine whether the

plaintiff's speech in this case was, in fact, protected. Instruction No. 9 created a

hybrid of the second and third prong of the <u>Pickering/Connick</u> analysis. Thus, the

---

[3]The defendants point to two other jury instructions to support their argument.
Jury Instruction No. 3 provided:

> With respect to her First Amendment claims, the plaintiff contends that the
> defendant retaliated against her for her exercise of her rights to freedom of
> speech and freedom of association, both of which are protected by the First
> Amendment.

Jury Instruction No. 7 stated:

> The First Amendment gives the plaintiff a constitutionally protected right to speak
> out in support of her opinions and beliefs and to otherwise disagree with the
> actions of the defendants. In addition, the First Amendment protects the plaintiff's
> right to associate with such persons in her personal and/or her professional life as
> she so chooses without retaliation from EWC. In essence, the plaintiff's right to
> free association includes the right to be free from personality control by the
> defendants. She cannot be required to conform to their personal and subjective
> ideas of behavior nor can she be required to refrain from dissenting, criticizing or
> disagreeing with the views of the college under the First Amendment.

district court erred by instructing the jury that it could perform the balancing test that Pickering and Connick require the court to perform. Wren, 798 F.2d at 1318; see also Loya v. Desert Sands Unified Sch. Dist., 721 F.2d 279, 281-82 (9th Cir. 1983).

The district court apparently reached the legal conclusion that the six instances of speech that the plaintiff relies upon were protected by the First Amendment under the first two parts of the Pickering/Connick analysis.[4] The district court erred, however, by failing to inform the jury of this legal finding. The record is filled with expression by Gardetto which may or may not be protected by the First Amendment as a matter of law. Thus, the district court must tell the jury which incidents of expression deserve First Amendment protection to enable the jury to apply the third and fourth steps of the Pickering/Connick analysis to Gardetto's legally protected expression. See Knapp v. Whitaker, 757 F.2d 827, 845 (7th Cir.), cert. denied, 474 U.S. 803 (1985) (holding that after the district court determined that the plaintiff's speech was

_____

[4]The court made explicit reference to five of the six instances in its order denying summary judgment. See Gardetto, 854 F. Supp. at 1536. Although the court omitted discussion of Gardetto's campaign support for the three board challengers, this activity is clearly subject to First Amendment protections, as discussed in Part I. In addition, the court took under advisement the defendants' renewed motion for summary judgment with respect to Gardetto's First Amendment claims at the time he charged jury. In the renewed motion, defendants reiterated their argument that Gardetto's speech was not protectible under the first two steps of the Pickering/Connick analysis. The court denied the motion after the close of the evidence.

protected, "the court was required to inform the jury of its ruling that Knapp's speech was constitutionally protected").

Instructions Nos. 3 and 7 fail to ameliorate this error. Instruction 3 briefly describes the general content of the First Amendment and the broad nature of plaintiff's claims. Instruction No. 7 elaborates upon Instruction No. 3 and concludes with the statement, "[s]he cannot be required . . . to refrain from dissenting, criticizing or disagreeing with the views of the College under the First Amendment." This portion of Instruction No. 7 is clearly at odds with the language in Instruction No. 9 that informs the jury that it is within their province to determine "whether or not the defendants justifiably or appropriately restricted the plaintiff's First Amendment rights."

We also conclude that Special Interrogatories 1(a) and 2(a) fail to cure the district court's error. The interrogatories asked the jury to assess whether "the plaintiff's protected speech was a motivating factor" in the defendants' adverse employment decisions. We recognize that "[a]n error in jury instructions will mandate reversal of a [civil] judgment only if the error is determined to have been prejudicial after reviewing the record as a whole." Brown v. Wal-Mart Stores, Inc., 11 F.3d 1559, 1564 (10th Cir. 1993). The jury's finding in the Special Interrogatories that Gardetto's "protected" speech did not motivate defendants to demote and suspend her does not render the court's error harmless. By answering

"no," the jury could have found that the speech in question was not entitled to First Amendment protection at all, rather than that the speech did not motivate the defendants to suspend the plaintiff. This result impermissibly allows the jury to conduct the balancing test in step two of the Pickering/Connick analysis.

The Eighth Circuit confronted a similar blending of legal and factual issues within a single interrogatory in Roberts v. Van Buren Public Schools, 773 F.2d 949 (8th Cir. 1985). Roberts involved a school district's decision not to renew the contracts of teachers involved in filing union grievances against the district. The court's interrogatory to the jury asked, with respect to each teacher:

> Do you find that [teacher's name] was engaged in activity protected by the First Amendment and that the protected activity was a substantial or motivating factor in any of the defendants [sic] decisions not to renew her teaching contract?

Id. at 953 (omission and emphasis in original). The court concluded that "[b]ecause the interrogatory . . . combined the issues of protected conduct and causation, we cannot tell how the jury decided the latter issue, and we must remand for further proceedings on [the plaintiff's] claim that she was impermissibly discharged for her union activities." Id. at 958; see also Loya, 721 F.2d at 281-82. The same is true in this case. Thus, we must remand the case in order to allow the district court to inform the jury what portion of Gardetto's speech is protected and to allow the jury to perform a precise and unambiguous application of steps three and four of the Pickering/Connick analysis.

In sum, the jury instructions allowed the jury to determine whether a given piece of Gardetto's speech was protected by the First Amendment by allowing the jury to consider whether the defendants justifiably restricted her First Amendment rights. Thus, the jury could have determined that some of Gardetto's speech that was legally entitled to First Amendment protection was, in fact, not entitled to such protection. We cannot be certain that the "jury implicitly reached the correct result." Wren, 798 F.2d at 1318. Therefore, the district court's error requires a new trial.

## CONCLUSION

We VACATE the judgment below and REMAND this case to the district court for a new trial, consistent with this opinion, on the plaintiff's First Amendment claims. Because further proceedings are required, we do not reach the plaintiff's evidentiary claim.