**Donald A. COOPER, Plaintiff,**

v.

**TOWN OF BAR NUNN, and Charles Anderson, individually and in his Capacity as Fire Chief of the Town of Bar Nunn, Defendants.**

**No. 02–CV–1072–B.**

United States District Court,
D. Wyoming.

April 14, 2003.

Keith R. Nachbar, Casper, WY, for Plaintiff.

Judith A. Studer, Rick L. Koehmstedt, Schwartz Bon Walker & Studer, Casper, WY, for Defendant.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

This case arises from the Bar Nunn Volunteer Fire Department's termination of Plaintiff. The matter is before the Court on Defendants' Motion for Summary Judgment. Upon reading the briefs, hearing oral argument, and being fully advised of the premises, the Court FINDS and ORDERS as follows:

### Statement of Parties and Jurisdiction

Plaintiff Donald A. Cooper ("Plaintiff") is a 59–year–old resident of Natrona County, Wyoming. Plaintiff was an employee of Defendant Town of Bar Nunn, Wyoming.

Defendant Town of Bar Nunn, Wyoming ("Bar Nunn") is a municipal corporation in Wyoming. Defendant Charles Anderson ("Anderson") is Fire Chief for Bar Nunn.

This Court exercises federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. Venue is proper under 28 U.S.C. § 1391(b).

### Background

Plaintiff volunteered to be a member of the Bar Nunn Volunteer Fire Department in 1996. When Plaintiff joined, he had recently been terminated from the Natrona County Volunteer Fire Department for insubordination.

Plaintiff filled out a membership application for the Bar Nunn Volunteer Fire Department ("Department"). This application did not contain any guarantees of continued membership, and it explained that the position was strictly volunteer and that the applicant was to donate time to the Department as a public service. The Department approved Plaintiff's application, and he officially became a member. Between 1996 and 1998, Plaintiff regularly attended training meetings, business meetings, and fire calls for the Department.

In late 1999 or early 2000, Department members began discussing the idea of a live training exercise on the 7L Ranch. The ranch was owned by Plaintiff's brother, Douglas Cooper, and was located north of Casper. This "7L Burn" exercise was planned for April 8, 2000. The members who led the 7L Burn had little or no training on the methods and techniques for safely conducting a prescribed burn.

A planning meeting for the 7L Burn exercise was held on April 5, 2000. At that meeting, a "burn plan" was handed out to all members. The members also discussed the specific weather parameters in which the exercise would take place. Plaintiff did not attend this meeting. Plaintiff and Anderson were not present at the time the 7L Burn was planned or conducted.

On April 8, 2000, all available Department members traveled to the 7L Ranch. The location for the burn was very flat and covered with grass and sagebrush. Because of recent snowfall, the sagebrush was wet. Although the grass had dried somewhat, overall damp conditions prevailed. The weather forecast indicated low winds, which would be favorable for the burn exercise. Thus, the Department members proceeded with the burn as scheduled, after having another on-site meeting to discuss safety. Weather and humidity readings were taken again, and Douglas Cooper brought an extra water truck to the location of the exercise.

At the ranch, the firefighters lit the prairie on fire as a training exercise, without first having obtained predictions of fire behavior, fire travel speed, fire intensity, weather conditions, or an assessment of fuel moisture or fuel load. Additionally, the Department had not notified the public, the Bureau of Land Management ("BLM"), or the Wyoming State Forestry Division about the burn exercise.[1] During the burn exercise, the fire was controlled and did not cause any unwanted property damage.

---

1. Defendants contend that prior to the exercise, Douglas Cooper notified Chief Clyde Young of the Natrona County Fire District and County Fire Warden Jim Sullivan, of the Department's intent to conduct a live fire training exercise.

At all times during the exercise, the weather conditions were within the safety parameters articulated in the burn plan. However, the exercise was largely unsuccessful because the wet conditions made burning difficult. After the fire was fully extinguished, the members returned to Bar Nunn. Douglas Cooper, who was not on location when the exercise occurred, remained behind to ensure that there were no problems with the area. No injuries or adverse incidents resulted from the exercise.

At the regularly scheduled meeting, on April 19, 2000, Department members had an open forum to discuss and critique the exercise. Plaintiff attended and posed various questions to Assistant Chief Charles Johnson ("Johnson"). Plaintiff asked if the Department had obtained a site-specific ("spot weather") forecast from the BLM prior to beginning the exercise, and Johnson responded that it had not. Plaintiff then asked if the burn had performed as expected, and Johnson answered that he had not done any fire behavior calculations or made any estimates of the fire behavior. Next, Plaintiff asked of the room in general whether anybody had previous prescribed fire experience. Plaintiff learned that one or two other members had such experience. Plaintiff asked no other questions and made no other comments at that meeting. Plaintiff's questions were posed in an appropriate, courteous, and businesslike manner.

As the meeting was ending, Plaintiff took Johnson aside and voiced his concerns about conducting the burn without having observed proper safety precautions. Plaintiff told Johnson that he was amazed at what they had done, and that they were fortunate to have gotten away with the manner in which they conducted the burn. Plaintiff also told Johnson that he needed to consider him as a resource, and that Plaintiff could be helpful in the future. Plaintiff believes that Johnson took offense to his comments, although the manner and tone of the discussion were no different than in a typical discussion at the fire station. At any rate, after a couple of minutes, the parties went home.

A day or two after the April 19 meeting, Anderson was informed of Plaintiff's behavior and told that Plaintiff continued badgering one or two members after the meeting regarding the training exercise. Anderson was also advised that Plaintiff had gotten into an argument with Johnson, who was acting as Fire Chief at the meeting. Based on this information, Anderson suspended Plaintiff, pending further investigation into the matter. Plaintiff was warned not to set foot on Department property or to respond to calls, or he would be arrested for trespassing. Plaintiff complied with the order.

Anderson interviewed the Department members present at the April 19 meeting. Anderson determined that Plaintiff could return to the Department with full duties and scheduled a meeting with Plaintiff to discuss the suspension. Around May 15, 2000, Anderson and Plaintiff met for lunch. Anderson informed Plaintiff that he had some work to do to resolve the matter, and that in the meantime, Plaintiff would stay on suspension.[2]

Plaintiff remained on suspension for a lengthy period of time and never received direct word from Anderson that his suspension had ended. In the winter of 2000–01, Plaintiff saw Anderson at a restaurant, where Anderson told Plaintiff that everything would be fine. In June 2001, Plaintiff saw Anderson at a party. When Plaintiff tried to initiate conversation, however, Anderson turned away. About two weeks

---

**2.** This account is Plaintiff's version of the conversation, and it is disputed.

later, without any warning, Plaintiff received a letter indicating that he was terminated from the Department because of his actions at the April 19, 2000 meeting.

Plaintiff filed his Complaint on November 4, 2002, alleging that Defendants violated his First Amendment rights by terminating him from the Department in retaliation for his exercise of free speech.[3] Plaintiff's Complaint asks for actual and punitive damages, attorneys' fees and costs, and injunctive relief in the form of reinstatement with the Department.

## Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court views the evidence in the light most favorable to the party opposing summary judgment. *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).

The party moving for summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to establish the existence of an essential element of the claims on which it bears the burden of proof at trial. *Id.* "While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the nonmovant's claim." *Jenkins*, 81 F.3d at 990.

To satisfy this burden, the nonmoving party must go beyond the pleadings and designate specific facts to make a showing that there is a genuine issue for trial. *Ford v. West*, 222 F.3d 767, 774 (10th Cir.2000). In order to successfully resist summary judgment, there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, a "mere . . . scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward*, 125 F.3d 1341, 1347 (10th Cir.1997).

## Analysis

### I. Legal Standards for First Amendment Retaliation Claims.

A four-step analysis is used to resolve First Amendment retaliation claims. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). First, a district court must determine whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." *Id.* at 146, 103 S.Ct. 1684. If so, the district court must balance the employee's interest as a citizen, in commenting upon matters of public concern, against "the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. If the balance tips in favor of the employee, the district court moves

---

**3.** At the summary judgment hearing, Plaintiff's counsel stated that the First Amendment retaliation claim was Plaintiff's only claim

to the third step, which requires the employee to "prove that the protected speech was a 'motivating factor' in the detrimental employment decision." *Melton v. Oklahoma City,* 879 F.2d 706, 713 (10th Cir. 1989) (internal quotation marks and citation omitted). If the employee makes this showing, the burden shifts "to the employer to show by a preponderance of evidence that it would have reached the same decision in the absence of the protected activity." *Id.; see also Dill v. City of Edmond,* 155 F.3d 1193, 1201 (10th Cir.1998). While the first two steps involve questions of law for the district court, the last two steps involve questions of fact for the jury. *Melton,* 879 F.2d at 713.

### A. Matters of Public Concern.

 The threshold question for a First Amendment retaliation claim is whether the employee spoke "as a citizen upon matters of public concern," or merely "as an employee upon matters only of personal interest." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. When making this determination, the district court must consider the content, form, and context of a given statement. *Id.* at 147–48, 103 S.Ct. 1684. Matters of public concern are those that can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. 1684. This protected speech includes "speech alleging a danger to public health or safety." *Lee v. Nicholl,* 197 F.3d 1291, 1296 (10th Cir.1999) (citations omitted). Furthermore, "the choice to speak through a private forum, rather than a public one, does not remove the speech from First Amendment protection." *Id.* at 1295.

 The district court must "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or

whether it had a broader public purpose." *Gardetto v. Mason,* 100 F.3d 803, 812 (10th Cir.1996). In other words, the Court must evaluate whether the plaintiff "spoke out based on the same motivation that would move the public to speak out." *Id.* Even where speech only partially concerns a matter of public concern, it is still protected First Amendment speech to the extent it contains matters of public concern. *See Finn v. New Mexico,* 249 F.3d 1241, 1248–49 (10th Cir.2001).

### B. Balancing the Employer's Interests and the Employee's Rights.

 In performing the *Pickering* balancing test, the district court should not consider the plaintiff's statements in a vacuum; rather, the manner, time, place, and context of the employee's expression are relevant. *Connick,* 461 U.S. at 152–53, 103 S.Ct. 1684. Under the balancing test, "the employee's First Amendment free speech rights are protected unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Gardetto,* 100 F.3d at 815 (internal quotation marks and citation omitted). "Relevant considerations include whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (quoting *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)) (internal quotation marks omitted). "The government, however, cannot rely on purely speculative allegations that certain statements caused or will cause disruption to justify

and that he did not intend to assert a due

process claim.

the regulation of employee speech." *Gardetto*, 100 F.3d at 815–16.

## II. *Application.*

### A. Matters of Public Concern.

Plaintiff argues that his questions and comments at the critique meeting were on a matter of public concern. Defendants argue that Plaintiff's questions and comments were motivated by personal, not public, concerns.

■ Speech on a matter of public concern can occur in a private forum. Plaintiff's private comments to Johnson were a follow-up to the matters discussed at a public meeting. Hence, there does not appear to be any compelling reason to view those comments differently from Plaintiff's questions at the meeting. The content of both Plaintiff's public questions and his private comments tend to evidence a concern for the safety of the burn exercise and the adherence to safety procedures. Even if Plaintiff was partially motivated by a desire to redress a personal grievance or to demonstrate his competence to the other Department members, the content and context of Plaintiff's speech precludes a finding that his speech was of a purely personal nature. Even "limited portions of [P]laintiff's speech that touch on matters of public concern are sufficient to satisfy the first step of the *Pickering* analysis." *Finn*, 249 F.3d at 1248–49.

Plaintiff's speech was made at a meeting convened for the purpose of critiquing the 7L Burn exercise. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem."), Ex. 3 (Kerns Dep.), p. 41). Plaintiff asked specific questions that he deemed necessary to evaluate the safety of the Department's conducting the burn and its compliance with standard procedure. Plaintiff testified that fire behavior calculations allow an informed prediction of the likelihood that the fire will cross the fire control lines. (Pl.'s Mem., Ex. 4 (Cooper

Dep.), pp. 82–83). On a wildland fire incident, all decisions should be based on current and expected fire behavior. (*Id.*, p. 94).

Plaintiff also stated that since weather is a crucial determinant of fire behavior, obtaining a forecast is one of the ten standard fire orders. (*Id.*, p. 89–90). Plaintiff testified that his question regarding which members had prior burn experience was prompted by the fact that the written burn plan did not look like any burn plan he had ever seen before. (*Id.*, p. 98). Such issues of public safety are concerns that would motivate a member of the public to speak out. Therefore, the Court finds that Plaintiff's speech can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers*, 461 U.S. at 146, 103 S.Ct. 1684.

### B. Balancing the Employer's Interests and the Employee's Rights.

■ Defendants argue that Plaintiff fails the *Pickering* balancing test. Anderson concluded that Plaintiff's conduct at the critique meeting was disruptive and that he needed to take action against Plaintiff to maintain discipline in the Department. (Mem. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem."), Ex. B (Anderson Aff.), p. 2). Even Plaintiff's brother, who is also a firefighter, testified that something had to be done because of the friction caused in the Department by Plaintiff's conduct. (Defs.' Mem., Ex. F (Douglas Cooper Dep.), p. 106). Defendants contend that Plaintiff ignored Anderson's and Douglas Cooper's efforts to communicate that he was no longer suspended, and that Plaintiff persisted in remaining on suspension. (Defs.' Mem., pp. 22–23; Ex. A (Cooper Dep.), pp. 122–23, 126–27). Furthermore, Defendants claim that Plaintiff's refusal to participate made the Department one member short

at all times, and that his insubordinate attitude toward Johnson undermined Johnson's authority and credibility. (Defs.' Mem., p. 24).

Plaintiff, on the other hand, argues that the *Pickering* balancing test tips in his favor. First, because his statements were made in the context of a critique meeting, they are protected. Furthermore, Randy Kerns, a witness at the meeting, testified that Plaintiff raised his concerns over the Department's burn procedures in a businesslike and courteous manner, (Pl.'s Mem., Ex. 3 (Kerns Dep.), p. 40), and that Plaintiff's questions did not end or cut short the meeting, (*id.*, p. 43). Kerns also testified that Plaintiff's comments did not have any adverse effect on attendance at meetings or training sessions. (*Id.*, p. 52). One long-time Department member, Toni Lattea, testified that the discussion was no different than what regularly took place at the fire hall. (Pl.'s Mem, Ex. 6 (Lattea Dep.), p. 29). Before the discussion at issue, Lattea had never seen Plaintiff involved in a heated discussion at the fire hall before, but she had seen Johnson involved in heated discussions on more than one occasion. (*Id.*, p. 30). Plaintiff testified that in his aside with Johnson, Plaintiff never cursed or made any sort of scene other than raising his voice, as did Johnson. (*See* Pl.'s Mem, Ex. 4 (Cooper Dep.), p. 170). Everyone interviewed by Anderson, besides Johnson, said that they could continue to work with Plaintiff. (Pl.'s Mem, Ex. 5 (Anderson Dep.), pp. 81, 83).

Moreover, Plaintiff argues that his non-participation in Department activities was a result of his suspension, not a refusal to participate. (Pl.'s Mem., p. 29). Plaintiff recounted that at their lunch meeting, Anderson told Plaintiff that he could put Plaintiff on the "inactive list" until Anderson could reconcile Plaintiff and Johnson. (Pl.'s Mem, Ex. 4 (Cooper Dep.),

p. 115–16). Plaintiff responded that he would rather remain suspended until Anderson got back to him. (*Id.*, p. 116). Plaintiff's understanding was that there was more that Anderson had to do before Plaintiff could return to work. (*Id.*). Plaintiff also testified that Anderson called Plaintiff one time after that, but Plaintiff could not talk because he was on his way to catch a plane flight, and that he had no convenient time to call Anderson after he returned. (*Id.*, pp. 117–19). According to Plaintiff, two weeks before Plaintiff was terminated, Anderson turned away when Plaintiff saw him at a party and tried to speak with him. (*Id.*, p. 130).

Given the evidence and testimony presented on both sides, the balance in this case favors Plaintiff. Defendants have not shown "that some restriction [was] necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Gardetto*, 100 F.3d at 815. There is little evidence that Plaintiff's questions and comments "impair[ed] discipline by superiors or harmony among co-workers, ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the performance of the speaker's duties or interfere[d] with the regular operation of the enterprise." *Id.* (citation omitted). Rather, the weight of the evidence points to the contrary. Of course, there remain obvious issues of witness credibility, especially with respect to the content of the communications and communication attempts (or lack thereof) between Anderson and Plaintiff regarding whether or not Plaintiff remained suspended. However, such credibility issues are for the jury, not the Court, to decide.

■ Furthermore, Plaintiff has raised a genuine issue of material fact as to whether his speech was a substantial motivating factor in his termination. In the

termination letter, Anderson wrote: "Due to our inability to resolve the problem of the disruption that occurred last year at the critique of the training exercise that was conducted, you're being terminated from the rolls of the Bar Nunn Volunteer Fire Department effective immediately." (Pl.'s Mem., Ex. 1 (Letter of Termination)). This evidence alone is sufficient to create an issue of fact for the jury. At trial, if Plaintiff establishes that his speech was indeed a substantial motivating factor in his termination, then Defendants will have the burden of proving that they would have reached the same decision even in the absence of Plaintiff's speech.

### III. *Qualified Immunity.*

■■ Defendants argue that Anderson is entitled to qualified immunity from Plaintiff's claims. The doctrine of qualified immunity "is designed to shield public officials from liability and ensure that erroneous suits do not even go to trial." *Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir.1995) (internal quotation marks and citations omitted). "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because qualified immunity is not merely a defense to liability, but also an immunity from suit and a protection from the burdens of litigation, summary judgment is appropriate "if the plaintiff has failed to come forward with facts or allegations that establish that the defendant has violated clearly established law." *Marshall v. Bd. of County Comm'rs,* 912 F.Supp. 1456, 1464–65 (D.Wyo.1996) (quoting *Sawyer v. County of Creek,* 908 F.2d 663, 665–66 (10th Cir. 1990)).

■■ For the law to be clearly established for qualified immunity purposes, there ordinarily "must be a [United States] Supreme Court or Tenth Circuit Court of Appeals decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Albright,* 51 F.3d at 1535 (internal quotation marks and citation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law, the unlawfulness must be apparent." *Lee,* 197 F.3d at 1294 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

■■■ "The case law of this Circuit makes it amply clear [that] public employee speech alleging a danger to public health or safety is protected by the First Amendment." *Lee,* 197 F.3d at 1296. Furthermore, the Tenth Circuit has held that an employer could reasonably be expected to know this. *Id.* at 1297. Plaintiff has come forward with sufficient facts and allegations that Anderson violated Plaintiff's clearly established First Amendment right to speech regarding public safety. Therefore, Anderson is not entitled to qualified immunity.

### IV. *Municipal Liability.*

■■ Defendants argue that Bar Nunn cannot be subject to municipal liability because there is no governmental custom or policy to support Plaintiff's claims. Under 42 U.S.C. § 1983, a local government is liable for its employees' constitutional violations when the employees acted pursuant to an unlawful official municipal policy or custom. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Hollingsworth v. Hill,* 110 F.3d 733, 742 (10th Cir.1997). There-

fore, to establish municipal liability, a plaintiff must show: (1) "the existence of a municipal custom or policy"; and (2) "a direct causal link between the custom or policy and the violation alleged." *See id.* Ordinarily, a single incident of unconstitutional activity is insufficient to impose municipal liability. *Jenkins,* 81 F.3d at 994. However, a single decision or act by a government official with final policymaking authority may create liability for the municipality under 42 U.S.C. § 1983. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *Jenkins,* 81 F.3d at 994.

██ Bar Nunn has delegated the responsibility "for the discipline, good order and proper conduct of the entire Department" to the Fire Chief. (Pl.'s Mem., Ex. 2 (Town of Bar Nunn Ordinances, § 1–9–1(D)(1))). Besides this Ordinance, there are no other documents, written policies, or procedures adopted with regard to the Department's administration. Thus, Anderson has final policymaking authority on behalf of Bar Nunn with respect to Department disciplinary matters, and every one of his decisions and actions in that province constitute the policy of Bar Nunn for purposes of municipal liability. Therefore, because Plaintiff alleges and presents evidence from which a reasonable jury could conclude that Anderson terminated him in violation of his First Amendment rights, Bar Nunn may be liable.

### Conclusion

For the aforementioned reasons, Defendants' Motion for Summary Judgment is **DENIED**.