**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 19 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

SARA W. McFALL, J.D.,

        Plaintiff - Appellee,

v.

JAMES D. BEDNAR, J.D., in his
individual capacity;

        Defendant - Appellant,

and

THE STATE OF OKLAHOMA
ex rel., THE OKLAHOMA
INDIGENT DEFENSE SYSTEM, a
state agency,

        Defendants.

No. 04-6122

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-03-0351-T)**

---

Robert M. Anthony, (Robert S. Lafferrandre with him on the briefs) Pierce,
Couch, Hendrickson, Baysinger & Green, L.L.P., Oklahoma City, Oklahoma for
Defendant-Appellant.

Scott F. Brockman, (Stanley M. Ward and Woodrow K. Glass with him on the
brief) Ward & Glass, L.L.P., Norman, Oklahoma for Plaintiff-Appellee.

Before **SEYMOUR** and **HARTZ**, Circuit Judges, and **BRACK**, District Judge.[*]

**BRACK**, District Judge.

Defendant-Appellant, Executive Director of the Oklahoma Indigent Defense System ("OIDS"), appeals from the district court's order denying his motion for summary judgment on a claim of qualified immunity. Defendant-Appellant ("Mr. Bednar") claims that he is entitled to qualified immunity because he did not violate clearly established law in terminating Plaintiff-Appellee Sara McFall ("Ms. McFall"). Mr. Bednar argues that he did not violate clearly established law in terminating Ms. McFall because i) she did not engage in constitutionally protected speech on a matter of public concern; and ii) Mr. Bednar's interest in operating an efficient workplace outweighed Ms. McFall's interest in unprotected speech. Our jurisdiction arises under 28 U.S.C. § 1291, and we AFFIRM.

## Background

OIDS provides representation to indigent criminal defendants. OIDS implemented a new procedure for the selection and retention of expert witnesses

---

[*]The Honorable Robert C. Brack, United States District Judge for the District of New Mexico, sitting by designation.

shortly before Ms. McFall began working there. Under the new procedure, either the Chief of Psychological Services, Dr. Kathy LaFortune ("Dr. LaFortune"), or the Chief of Forensic Services, Laura Schile ("Ms. Schile"), had to approve requests for experts. Dr. LaFortune was married to a prosecutor and was herself an attorney. Ms. Schile had previously worked in law enforcement and was not an attorney. James Bednar, Executive Director at OIDS, had final approval of the expert requests. OIDS implemented the new procedure to upgrade the quality of expert services for clients and reduce costs in the wake of state-wide budget cuts. Under the previous system, any Chief could approve the retention of an expert for up to $5,000.

On July 1, 2002, Ms. McFall began her six-week employment with OIDS. Ms. McFall served as Chief of the Capital Trials Norman Division and supervised a group of attorneys in their handling of the defense in capital cases.

On July 3, 2002, after meeting with her staff, Ms. McFall met with Mr. Bednar to discuss the new expert approval process. Ms. McFall expressed to Mr. Bednar concerns about: the amount of time it took to respond to requests for experts; the potential for conflicts of interest with Dr. LaFortune; and the competency of Dr. LaFortune and Ms. Schile to make trial strategy decisions and evaluate the need for experts.

On July 10, 2002, Jim Rowan ("Mr. Rowan"), one of the attorneys under

Ms. McFall's supervision, submitted a request to Ms. Schile for approval of expert witnesses in one of his cases (the *Jackson* case). Both Ms. Schile and Mr. Bednar knew that Mr. Rowan had to disclose his list of witnesses to the court by August 7, 2002. On July 31, 2002, Mr. Rowan and his co-counsel met with Ms. Schile to discuss the pending request. After the meeting, Ms. Schile complained to Mr. Bednar that Mr. Rowan had been rude to her and Mr. Bednar sent an email to Mr. Rowan stating that "your continued lack of cooperation and refusal to follow agency procedures will only result in a delay of your request for experts."

On August 5, 2002, Ms. McFall and Mr. Rowan decided that Mr. Rowan should approach the court in the *Jackson* case and make a record in order to preserve the issue on appeal that an expert had not been retained in time to meet the court imposed deadline due to a delay in OIDS's internal expert witness request process. On August 13, 2002, Ms. McFall and the other Chiefs met with Mr. Bednar. Ms. McFall again raised the issue of making a record for appeal in the *Jackson* case. Mr. Bednar prohibited Ms. McFall and all other attorneys from making such a record despite Ms. McFall's concerns that the quality of the legal services OIDS provided to clients and the attorneys' effectiveness would be scrutinized on appeal in that case.

In another instance regarding the *Jackson* case, Ms. McFall and Mr. Rowan expressed to Dr. LaFortune their concerns about a possible conflict of interest Dr.

LaFortune had in the approval of expert witnesses because her husband was the prosecutor who filed the original charges against Defendant Jackson. Thereafter, in a separate matter (the *Dobbs* case), Ms. McFall and another attorney she supervised expressed a conflict of interest concern with Dr. LaFortune because the court listed Dr. LaFortune as a witness at the preliminary hearing for Mr. Dobbs's co-defendant. Dr. LaFortune later complained that Mr. Rowan was rude to her in expressing his conflict of interest concerns. Mr. Bednar told the attorneys that if they did not follow the appropriate procedure and seek approval for their expert requests from Dr. LaFortune, he would deny their requests for funding.

On August 14, 2002, Mr. Bednar met with Ms. McFall and Mr. Rowan. At that meeting, Mr. Bednar terminated Mr. Rowan. One of the reasons he gave for Mr. Rowan's termination was Mr. Rowan's alleged rudeness to Dr. LaFortune. Mr. Bednar also told Ms. McFall "you didn't rein him in." He then offered her an alternative position as a capital trial lawyer at a reduced salary. Ms. McFall subsequently removed her personal belongings and received a letter of termination shortly thereafter.

Ms. McFall sued Mr. Bednar and OIDS under 42 U.S.C. § 1983 alleging violations of her First Amendment right to freedom of speech and freedom of association. Mr. Bednar moved for summary judgment on both claims and

asserted a defense of qualified immunity. On March 3, 2004, the United States District Court for the Western District of Oklahoma granted Mr. Bednar's summary judgment motion with respect to Ms. McFall's freedom of association claim, but denied his motion on her free speech claim and rejected his assertion of qualified immunity. Mr. Bednar appeals the district court's ruling that he is not entitled to qualified immunity because Ms. McFall's speech was constitutionally protected.

Discussion

A. Standard of review

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). This Court has held that: "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.' " *Muñoz v. St. Mary Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (*quoting* FED. R. CIV. P. 56(c)). When applying this standard, the Court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id.*

A district court's "denial of a summary judgment motion ordinarily is not an appealable final order." *Bass v. Richards*, 308 F.3d 1081, 1086 (10th Cir.

2002).  The denial of a summary judgment motion is subject to appeal, however, when the defendant is a public official asserting a qualified immunity defense and the issue on appeal is whether the defendant violated clearly established law.  *Id.* In other words, "the scope of interlocutory appeals to denials of qualified immunity is limited to 'purely legal' challenges to the denial."  *Id.*  (internal citations omitted).

In appealing the district court's denial of summary judgment based on qualified immunity, Mr. Bednar raises the issue of whether it was clearly established that Ms. McFall's speech constituted protected speech on a matter of public concern.  This is a "purely legal" issue and we have jurisdiction to address it.  *Id.*  We, therefore, review the district court's denial of summary judgment on the basis of Mr. Bednar's qualified immunity defense *de novo*.  *Finn v. New Mexico*, 249 F.3d 1241, 1247 (10th Cir. 2001) (citations omitted).

B. Qualified immunity

Our courts recognize two kinds of immunity defenses: absolute immunity and qualified immunity.  *See Harlow v. Fitzgerald,* 457 U.S. 800, 807 (1982). The defense of absolute immunity is available to "officials whose special functions or constitutional status requires complete protection from suit . . . ." *Id.* For instance, legislators are entitled to absolute immunity in their legislative functions and judges are entitled to absolute immunity for actions taken in their

judicial capacity. *Id.* For other government officials, however, "our cases make plain that qualified immunity represents the norm." *Id.*

The qualified immunity defense attempts to strike a balance between "the importance of a damages remedy to protect the rights of citizens, [and] 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Id.* (internal citations omitted). Without the qualified immunity defense, courts would struggle to curtail the substantial social costs associated with harassing litigation involving government officials, including the fear that personal monetary liability would "unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

The doctrine of qualified immunity, therefore, shields government officials performing discretionary functions from liability for civil damages arising from 42 U.S.C. § 1983 claims brought against them in their individual capacities. *Harlow*, 457 U.S. at 818. Moreover, the courts draw no distinction between 42 U.S.C. § 1983 suits against state officials and suits against federal officials under the Constitution. *Id.* Because Mr. Bednar is a state official being sued in his individual capacity under 42 U.S.C. § 1983, his assertion of the qualified immunity defense is proper.

Individual government actors retain their immunity unless the plaintiff can

show that they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. Mr. Bednar is entitled to qualified immunity, therefore, unless he violated a clearly established constitutional right. According to the Supreme Court, "[i]f the law at that time was not clearly established, an official could not reasonably be expected to 'know' that the law forbade conduct not previously identified as unlawful." *Id.* at 819.

The Court, therefore, must first determine "whether the plaintiff has alleged a deprivation of a [statutory or] constitutional right at all" and only if the answer to that question is yes does the Court consider whether that right was clearly established at the time so that reasonable officials would have understood that their conduct violated that right. *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n.5 (1998); *Trotter v. The Regents of the Univ. of New Mexico,* 219 F.3d 1179, 1184 (10th Cir. 2000). We have previously held that when "a government official raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must produce facts sufficient to show both that the defendant's alleged conduct violated the law and that [the] law was clearly established when the alleged violation occurred." *Bruning v. Pixler*, 949 F.2d 352, 356 (10th Cir. 1991) (internal quotations omitted). Only after the plaintiff has met this burden "must the defendant bear the usual summary judgment

-9-

movant's burden of showing that no material issues of fact remain that would defeat his or her claim of qualified immunity." *Id.*

In order for the law to be clearly established there must have been a Supreme Court or other Tenth Circuit decision on point so that "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Finn*, 249 F.3d at 1250 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### C. Whether Ms. McFall's termination violated clearly established law

Mr. Bednar violated clearly established law, and thus is not entitled to qualified immunity, if he terminated Ms. McFall for exercising her free speech rights. The Supreme Court outlined the test for a 42 U.S.C. § 1983 free speech claim in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), and its progeny. The Court must first determine whether the employee's speech touches on a matter of public concern. *Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998). If it does, the Court must balance the employee's interest, as a citizen, in commenting upon matters of public concern against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through it's employees." *Pickering*, 391 U.S. at 568.

If the first two prerequisites are met, the speech is protected and the plaintiff must show that her speech was a substantial or motivating factor behind

the adverse employment decision. *See Belcher v. City of McAlester, Oklahoma*, 324 F.3d 1203, 1206-07 (10th Cir. 2003); *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996). If the plaintiff satisfies all these factors then the burden shifts to the employer to show, by a preponderance of the evidence, that it would have acted in the same way toward the employee in the absence of the protected speech. *Belcher v. City of McAlester, Oklahoma*, 324 F.3d 1203, 1206-07 (10th Cir. 2003); *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996).

We have previously held that "[w]hether speech involves a matter of public concern and whether the employee's interest outweighs the employer's are questions of law for the court; whether speech was a substantial motivating factor and whether the employer would have made the same employment decision in the absence of the speech are questions of fact for the jury." *Bass*, 308 F.3d at 1088. Mr. Bednar's appeal relating to Ms. McFall's *Pickering* claim therefore raises two issues: whether Ms. McFall spoke on a matter of public concern and whether OIDS's interest in maintaining an efficient work environment outweighs Ms. McFall's interest in commenting on matters of public concern. Therefore, we will address only these questions with respect to the *Pickering* analysis. *Bass*, 308 F.3d at 1088.

First, Ms. McFall must establish that she engaged in protected speech on a matter of public concern. The threshold inquiry "in assessing the free speech

-11-

claim of a discharged government employee," therefore, is "whether the employee has spoken 'as a citizen upon matters of public concern' or merely 'as an employee upon matters only of personal interest.'" *Finn*, 249 F.3d at 1247 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Whether an employee's speech addresses a matter of public concern depends on the content, form, and context of the statements and whether the speech can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146-48 (1983); *see also Belcher*, 324 F.3d at 1207-08 (finding that firefighter's expression of concern to city council members over the purchase of a new fire truck with city tax dollars involved a matter of public concern); *Dill*, 155 F.3d at 1202 (finding police officer's comments that exculpatory evidence was withheld in a murder investigation involved a matter of public concern); *but see Koch v. City of Huchinson*, 847 F.3d 1436, 1443-44 (10th Cir. 1988) (holding that fire marshal's report concerning the cause of a fire did not involve a matter of public concern).

The district court held that Ms. McFall's speech touched on a matter of public concern because it dealt with "the proper investigation of criminal cases and provision of effective assistance of counsel to indigent defendants accused of capital crimes." *McFall v. Bednar, et al.*, No. 03-351, slip op. at 12 (W.D. Okla. Mar. 3, 2004). Mr. Bednar correctly argues that "speech pertaining to internal

-12-

personnel disputes and working conditions ordinarily will not involve public concern." *Finn*, 249 F.3d at 1247; *see also Dill*, 155 F.3d at 1202. The district court, however, correctly reasoned that Ms. McFall's speech about the expert approval process "went beyond her concern that the process was internally cumbersome and time consuming . . . [r]ather, Plaintiff's expressed concern centered on the fact that the inability to secure the services of expert witnesses in death penalty cases could deprive the indigent defendants of their constitutionally guaranteed right to effective assistance of trial counsel." *McFall v. Bednar, et al.*, No. 03-351, slip op. at 11-12 (W.D. Okla. Mar. 3, 2004).

Ms. McFall's speech did not involve mere internal personnel disputes over OIDS's procedures for approving experts. Indeed, there is no indication that Ms. McFall refused to follow the appropriate procedures in requesting experts on behalf of the attorneys she supervised or in any way attempted to subvert the expert approval process. Rather, her speech related to the qualifications of Dr. LaFortune and Ms. Schile to approve experts in capital cases and her concerns about the inability to get timely decisions. Ms. McFall expressed her concerns that under the new expert approval system, the indigent defendants OIDS represented were not receiving effective assistance of counsel, which prevented them from receiving a fair trial. The right to effective assistance of counsel and the right to a fair trial are rights granted to all criminal defendants by the Sixth

Amendment. U.S. CONST. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Fisher v. Gibson*, 282 F.3d 1283, 1290 (10th Cir. 2002).

A government employee's "[s]peech that seeks to expose improper operations of the government or questions the integrity of government officials clearly concerns vital public interests." *Finn*, 249 F.3d at 1247 (quoting *Conaway v. Smith*, 853 F.2d 789, 797 (10th Cir. 1988)); *see also Dill*, 155 F.3d at 1202 (internal citations omitted) (holding that "speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials . . . clearly concerns matters of public import.") Because Ms. McFall's speech related to matters of "political, social, or other concern to the community," that is, the integrity and qualifications of public officials, the operations of government, and the right of a criminal defendant to effective assistance of counsel, it touched on matters of public concern. *Conaway*, 853 F.3d at 797. Viewing the facts in the light most favorable to Ms. McFall, she has satisfied the first prong of the *Pickering* analysis.

Under the second prong of the *Pickering* test, the Court must weigh Ms. McFall's interest in commenting on matters of public concern against OIDS's interest in maintaining an efficient work environment. We "balance the employee's interest in commenting upon matters of public concern 'against the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.'" *Dill*, 155 F.3d at 1201 (quoting *Pickering*, 391 U.S. at 568)). Moreover, "[i]n evaluating the employer's interest, we consider 'whether the statement impairs discipline by superiors or harmony among co-workers . . . or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Finn*, 249 F.3d at 1249 (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). In other words, the employer must show that the employee's speech caused some disruption in the workplace. *Belcher*, 324 F.3d at 1208-09 (holding that although the government employer need not "wait for speech actually to disrupt core operations before taking action," it can not restrict the employee's speech unless it shows the restriction is necessary to prevent the disruption of official functions); *see also Dill*, 155 F.3d at 1203. In determining whether an employee disrupted the workplace, the Court can consider whether the employee used internal rather than external channels to exercise their free speech rights. *Belcher*, 324 F.3d at 1208.

In this case, Mr. Bednar concedes that Ms. McFall's speech did not cause any actual disruption at OIDS. Mr. Bednar never argues that Ms. McFall refused to follow the new expert approval procedure or that she could have expressed herself through less disruptive internal channels. Viewing the facts in the light most favorable to Ms. McFall, she expressed her concerns over the new expert approval process without any resultant disruption at OIDS. Ms. McFall,

-15-

therefore, has satisfied this prong of the analysis for purposes of Mr. Bednar's qualified immunity defense. Because Ms. McFall satisfied the first two prongs of *Pickering*, her speech was constitutionally protected.

Having determined that Ms. McFall's speech was protected the final inquiry for the Court is whether the law was clearly established on and before August 14, 2002, that Mr. Bednar could not terminate Ms. McFall's employment for engaging in such speech. Our decision in *Finn v. New Mexico* is directly on point and was issued in May 2001, before Ms. McFall was terminated. In *Finn*, we held that "pre-September 1995 case law clearly established that the defendant's decision to terminate plaintiff in retaliation for his protected speech was actionable. Hence the district court properly rejected the qualified immunity defense . . . ." *Id.* Furthermore, "[a] public employer cannot retaliate against an employee for exercising his constitutionally protected right of free speech." *See Dill*, 155 F.3d at 1201 (citing *Connick*, 461 U.S. at 142).

It was clearly established on and before August 14, 2002, therefore, that a government employee could not be terminated for speaking out on matters of public concern. Mr. Bednar, himself an attorney and former judge, and any other reasonable official, would understand that firing an employee for exercising her free speech rights violated clearly established law and that such a termination was actionable under 42 U.S.C. § 1983. The district court, therefore, properly rejected

-16-

Mr. Bednar's qualified immunity defense.

## Conclusion

Viewed in the light most favorable to Ms. McFall, she engaged in constitutionally protected speech on a matter of public concern. In addition, Mr. Bednar's interest in running an efficient workplace did not outweigh Ms. McFall's right to engage in constitutionally protected speech. Because it was clearly established during Ms. McFall's employment with OIDS that a government employee cannot be terminated for exercising her constitutionally protected free speech rights, the district court properly rejected Mr. Bednar's qualified immunity defense. Accordingly, the district court's order denying summary judgment based on Mr. Bednar's assertion of qualified immunity is hereby AFFIRMED.