Anthony D. **SHAPIRO**, Plaintiff,

v.

Marcus **RYNEK**, in his individual capacity, and Steven Doane, in his individual capacity, Defendants.

Civil Action No. 13–cv–3086–WJM–KMT

United States District Court,
D. Colorado.

Signed 09/16/2016

Laura Lee Rovner, Danielle C. Jefferis, Lindsey De Soto Webb, Nicole Brianne Godfrey, University of Denver–Sturm College of Law, Denver, CO, for Plaintiff.

Jacquelynn Nichole Rich Fredericks, Kristin A. Ruiz, Colorado Attorney General's Office, Denver, CO, for Defendants.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

William J. Martínez, United States District Judge

Plaintiff Anthony Shapiro ("Shapiro") is an inmate at the Sterling Correctional Facility ("Sterling") of the Colorado Department of Corrections ("CDOC"). He sues two CDOC guards, Marcus Rynek ("Rynek") and Steven Doane ("Doane") (together, "Defendants"), claiming that one of them (but not both) is responsible for an alleged mass strip search in violation of his Fourth Amendment rights.

Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 116.) For the reasons explained below, Defendants' motion is denied. The Court also denies Shapiro's request that partial summary judgment be entered in his favor despite not having cross-moved for summary judgment.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to one party or another.

### A. CDOC Strip Search Policy & Procedure

Pursuant to CDOC's Administrative Regulation 300–06 ("AR 300–06"), offenders may be strip searched before being transported outside of a CDOC facility. (ECF No. 76–1 § IV.D.4.b; ECF No. 116 at 3, ¶ 9.) The Regulation states that offender privacy shall nonetheless "be maintained by use of a privacy screen, barrier, or other appropriate location," to "prevent intimate parts of the offender from being exposed to other offenders or employees not conducting or supervising the search or providing security for the strip search." (ECF No. 76–1 § IV.D.4.b.) However, "[i]n

emergency situations when the use of the privacy screen would compromise prison security, the privacy screen will not be utilized." (*Id.*)

CDOC's purpose in conducting pre-transport strip searches "is to ensure the safety of the public, staff, and the offender population," given that contraband may be hidden on the body or in body cavities. (ECF No. 116 at 3–4, ¶¶ 11–12.) To accomplish this purpose, a male offender is required to remove all clothing, run his fingers through his hair, lift and separate his penis from his scrotum, spread his buttocks, squat and cough, and also demonstrate that nothing is hidden behind his ears, or in his nose, mouth, hands, armpits, or rolls of skin, or under his feet, or between his toes. (ECF No. 76–1 § IV.D.5.) This search is a visual search only, *i.e.*, the inspecting officer does not make physical contact with the offender's body. (*Id.* § IV.D.1.)

### B. Strip Search of Shapiro in December 2012

On December 6, 2012, Shapiro and ten other male offenders were scheduled to be transported from Sterling to Denver—in Shapiro's case, to provide witness testimony in a civil court proceeding. (ECF No. 116 at 5, ¶ 18; *id.* at 6, ¶ 25.) Such transportation was to be carried out by a Denver-based CDOC unit known as the Northern Transport Unit ("NTU"). (*Id.* at 2, ¶¶ 4–5; *id.* at 5, ¶ 18.)

Early that morning, Shapiro was escorted from his cell to Sterling's intake and receiving area. (*Id.* at 6, ¶ 26.) He waited there in a holding cell for an unspecified amount of time. (*Id.* ¶¶ 28, 30.) At some point, he was ordered to submit to a strip search. (*Id.* at 7, ¶ 32.) Shapiro claims that he and ten other male offenders in the holding cell were then simultaneously strip searched, with no privacy screens or barri-

ers to prevent offenders from viewing each other's bodies. (*Id.* ¶ 33; ECF No. 120 at 11, ¶¶ 6–7.)

Defendants dispute this claim, insisting that whatever strip search was performed was done privately for each offender (ECF No. 122 at 2 n.1), but Defendants are willing to accept Shapiro's version of events for summary judgment purposes (ECF No. 116 at 7 n.1). According to Shapiro, then, he and the ten other offenders stood naked together in the pre-transport holding cell and permitted a CDOC officer to visually inspect the areas of the their bodies required by AR 300–06. (ECF No. 120 at 11, ¶ 5.)

The parties agree that the strip search was ordered and performed by one male prison guard acting alone. (ECF No. 116 at 7, ¶ 34; ECF No. 120 at 9, ¶ 34.) Whether that guard was Rynek or Doane (or someone else) is somewhat uncertain, as will be discussed below in Part III.B.

Apparently the strip search found nothing on any offender, and NTU transported all offenders to Denver and back without incident.

## III. ANALYSIS

### A. Liability and Qualified Immunity

■ Defendants principally argue that a group strip search of the size and characteristics alleged by Shapiro—eleven offenders in a holding cell being inspected by a single prison guard of the same gender—is not a constitutional violation, or at least not a clearly established constitutional violation (such that it could overcome qualified immunity). *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.").

■ The Court finds that Defendants' argument is best evaluated from the latter question, *i.e.*, whether it is clearly established that Shapiro's constitutional rights were violated by the group strip search in question here. "In order for the law to be clearly established there must have been a Supreme Court or other Tenth Circuit decision on point so that the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right." *McFall v. Bednar*, 407 F.3d 1081, 1087 (10th Cir. 2005) (internal quotation marks omitted; alterations incorporated). The Court will therefore examine what the Supreme Court and Tenth Circuit have said on the subject.

#### 1. Relevant Precedent Regarding Strip Searches

Apparently *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), is the Supreme Court's only direct discussion of the constitutionality of prison strip searches. *Bell*, however, did not consider strip searches from the perspective of group versus private searches. *Bell* instead considered whether prison officials could conduct strip searches, including visual body-cavity inspections, solely for the contraband-deterrent effect of such searches, *i.e.*, without probable cause. *Id.* at 558, 560, 99 S.Ct. 1861. The Supreme Court assumed without deciding "that inmates, both convicted prisoners and pretrial detainees, retained some Fourth Amendment rights upon commitment to a correctional facility." *Id.* at 558, 99 S.Ct. 1861. The Court nonetheless found the suspicionless searches to be reasonable. *Id.* at 558–59, 99 S.Ct. 1861. In so doing, the Court reiterated the general standard for evaluating reasonableness: "Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which

it is conducted." *Id.* at 559, 99 S.Ct. 1861. Given these considerations, *Bell* held that visual body-cavity strip searches without probable cause were reasonable in light of correctional security needs. *Id.* at 559–60, 99 S.Ct. 1861.

*Bell* cited approvingly a Tenth Circuit case, *Daughtery v. Harris*, 476 F.2d 292 (10th Cir. 1973), as an example of a lower court decision that had already "upheld such a visual body-cavity inspections against constitutional challenge." *Bell*, 441 U.S. at 560 n.41, 99 S.Ct. 1861.[1] *Daughtery*, unlike *Bell*, did address the question of group versus private strip searches. But *Daughtery* did not provide much context for this debate, instead simply announcing that the court rejected the appellants' contentions that "the searches must be conducted by medical doctors and in complete privacy." 476 F.2d at 294.

The Tenth Circuit's first post-*Bell* decision regarding strip searches appears to be *Hill v. Bogans*, 735 F.2d 391 (10th Cir. 1984). The plaintiff in *Hill* was arrested on a bench warrant for failure to appear at a court hearing regarding a traffic violation. *Id.* at 392. In the "prison area" of the police station to which he was transported, he was required to "face the wall ... and drop his pants and undershorts" for a visual inspection of his backside and pants. *Id.* at 393. This was done in full view of "ten to twelve people in the immediate vicinity," *id.* whom the opinion does not otherwise describe.

In evaluating the constitutionality of the strip search, the Tenth Circuit invoked the basic Fourth Amendment considerations noted in *Bell*: " 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' " *Id.* at 393–94 (quoting *Bell*, 441 U.S. at

559, 99 S.Ct. 1861). The court found it particularly important that the plaintiff had been arrested "while on his way to work at about 7:30 a.m. for an outstanding speeding ticket and violation of a restriction on his driver's license. These are not offenses associated with the concealment of weapons or contraband in a body cavity." *Id.* at 394. Moreover, considering the scope of the intrusion and the place where it was conducted, "[a] jail's desire to maintain security, to avoid charges of discriminatory treatment, and to promote administrative convenience simply does not justify routine strip searches in a public area of persons detained for minor traffic offenses." *Id.* at 394–95. Thus, the search was a Fourth Amendment violation. *Id.* at 395.

Eighteen years after *Hill*, the Tenth Circuit again took up the strip search question in *Farmer v. Perrill*, 288 F.3d 1254 (10th Cir. 2002). *Farmer* involved a federal prisoner subject to a policy of visual strip searches every time she returned from the recreation yard to the cellblock. *Id.* at 1257. The searches were allegedly "conducted in an open area where she was viewed by a number of other inmates." *Id.* The district court denied summary judgment on qualified immunity grounds, and the defendants appealed, thus presenting the Tenth Circuit with the question of whether the law regarding strip searches was established with sufficient clarity such that denial of qualified immunity was proper. *Id.* at 1258–59.

The Tenth Circuit's analysis drew principally on *Bell* and *Hill*. *Id.* at 1259–60. In particular, the court characterized *Hill* as establishing two requirements for a non-private strip search: (1) "a sufficient security justification for the search" and (2) "a[ ] justification for conducting the search

---

1. *Daughtery* actually appears to consider strip searches with *physical* body cavity inspections, specifically, digital rectal exams. *See* 476 F.2d at 293.

in a public area." *Id.* at 1260. Given this, the Tenth Circuit held

> that plaintiff has identified a well established right, the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others *unless the procedure is reasonably related to a legitimate penological interest.* We also conclude that the identified right of the plaintiff was clearly established at the time of the May 1993 search in question so that a reasonable officer would have known that a decision to subject inmates to demeaning searches in public requires justification.

*Id.* (emphasis in original). This remains the Tenth Circuit's most recent pronouncement specifically on the standard for group strip searches.

### 2. The Need for a Justification Specific to the Group Nature of the Search

With this background, the Court returns to Defendants' argument that there is no clearly established law prohibiting a group strip search of eleven inmates. If this were solely a question of *numbers*, the Court would agree. *Daughtery* held that the Constitution does not require "complete privacy," 476 F.2d at 294, and *Farmer's* guidance regarding "several (or perhaps many) others," 288 F.3d at 1260, provides little clarity except in extreme cases.

■ However, Tenth Circuit law is clear that the number of inmates simulta-

neously strip searched is not the primary issue. The issue, rather, is whether there is "a sufficient security justification for the search" *and* "a[ ] justification for conducting the search in a public area." *Id.* at 1260. Defendants have satisfied the first requirement—the Court does not doubt the particular need for safety when transporting prisoners outside the walls of the prison. (*See* ECF No. 116 at 3, ¶ 11.) However, Defendants have offered no justification for conducting the search in a public area, *i.e.*, in a manner that permitted all inmates to see each other.[2] Defendants instead rest solely on the security justification as if that were enough to justify the strip search itself and the manner in which it was conducted.[3]

For the first time in their reply brief, Defendants assert

> that a non-routine facility disruption occurred immediately prior to the arrival of the transport bus, which required Rynek [to] respond to an in-progress use of force. This emergent incident within [the] Receiving [area] disrupted normal operations and presented an amplified security risk underscoring the import of searching these outgoing offenders.

(ECF No. 122 at 15 (citations omitted).) The Court could deem this argument waived, but the Court finds that it is not enough in any event to justify summary judgment.

---

**2.** Defendants seem to believe that *Farmer's* reference to "a public area" was some sort of technical term referring to locations viewable by persons other than the inmates being searched and the officers conducting the search. (*See* ECF No. 116 at 4, ¶¶ 14–15; ECF No. 122 at 16.) In other words, from Defendants' perspective, a strip search is not public if every inmate in the area is likewise strip searched. The facts of *Farmer* make clear, however, that a "public area" refers to locations viewable by anyone other than the specific inmate being searched and the officer(s) performing the search. *See Farmer*, 288 F.3d

at 1254 (discussing prison policy of strip searching all inmates returning from the recreation yard, and that the plaintiff's strip search was conducted "in the open area where she was viewed by a number of other inmates").

**3.** Defendants also cite a number of extra-circuit cases suggesting that inmate strip searches in small groups are presumptively acceptable. (*See* ECF No. 116 at 15–18.) In light of *Farmer,* it is clearly established that the Tenth Circuit takes a stricter approach.

Defendants introduced undisputed evidence in their opening brief that Rynek "responded to a use of force incident in the shower area of Intake and Receiving" around the time of the strip search. (ECF No. 116 at 9, ¶¶ 44–45.) The purpose of this evidence was apparently to bolster Rynek's claim that he was occupied elsewhere, and therefore not involved in the strip search. Defendants nowhere linked it to an emergency need to strip all of the offenders in the holding cell at once. Nor have Defendants submitted any evidence from which a jury could conclude that any prison official actually believed that the need to strip the offenders in the holding cell was somehow more urgent after the shower incident, such that privacy was no longer feasible. Accordingly, Defendants have still failed to provide a justification for the group strip search.

■ In sum, it has been clearly established for many years prior to December 2012 that group strip searches require a justification specific to the group nature of the search. Shapiro has presented evidence from which a jury could conclude that such a group search occurred without a justification specific to the group nature of the search. If a jury believes Shapiro's evidence, Defendants could not claim that the constitutional violation was not clearly established. Accordingly, Defendants are not entitled to qualified immunity at this summary judgment phase.

## B. Doane's Involvement & Counsel's Potential Conflict of Interest

■ As noted above, there is no dispute that one and only one male prison guard ordered and conducted the strip search. (ECF No. 116 at 7, ¶ 34; ECF No. 120 at 9, ¶ 34.) Shapiro positively identified this guard as Rynek, who is a Sterling prison guard (as opposed to an NTU guard). (ECF No. 116 at 2, ¶ 2; *id.* at 7–8, ¶¶ 35–36.) Two other offenders who were present

in the group being transported to Denver, Larry Harris and Lance White, also identified Rynek as the guard who ordered and performed the search. (*Id.* at 8, ¶ 37.) The parties deposed a number of other offenders who claim to have been present, but those offenders could not specifically identify which guard ordered and performed the search. (*Id.* ¶ 38.)

Although Shapiro is "sure" that the guard in question is Rynek (*id.* at 7, ¶ 35), his counsel has nonetheless constructed an argument that the guard might have been Doane, one of the three NTU officers present that morning (*id.* at 2, ¶ 3; *id.* at 5, ¶ 21). This argument runs as follows:

1. Rynek denies conducting the strip search and asserts that any strip search performed would have been done by the NTU officers in charge of driving the offenders to Denver. (ECF No. 120 at 12, ¶ 12.) The three NTU officers present that day, including Doane, also testified that NTU officers are responsible for strip searching inmates prior to transport. (*Id.* at 13, ¶ 14.) And Sterling's warden similarly testified that NTU conducts the pre-transport strip searches. (*Id.* ¶ 13.)

2. The officer in question "was white" and had "a medium to muscular build." (*Id.* ¶¶ 15–16.) Allegedly, Doane was the only white NTU officer present on the morning in question, and has "a medium to muscular physique." (*Id.* ¶¶ 17–18.)

3. Therefore, Doane might be the officer responsible.

Defendants do not dispute that they and every other relevant prison official believe that NTU officers would have performed the strip search. Defendants strongly contest, however, Shapiro's allegations about the race and body type of the officer in

question, and the comparison to Doane. (ECF No. 122 at 8–9, ¶¶ 15–18.)

As to the guard's appearance, offender Larry Harris specifically testified that the guard in question was white and had a "medium build." (ECF No. 120–11 at 6, 7.) Offender Lance White testified that the guard was "muscular." (ECF No. 120–12 at 7.) Both of these offenders went on to identify Rynek (from photographs, apparently). (*See* ECF No. 116 at 8, ¶ 37.) But even so, their testimony in the abstract supports the claim that whoever searched them was a white male with a medium, muscular build.

As to the assertions that Doane matches that description, and that Doane was the only white NTU officer that day, Shapiro attaches supporting photographs. (ECF No. 120 at 13, ¶¶ 17–18.) Defendants object that the photographs have not been previously disclosed, and that the assertions regarding Doane's appearance are unsworn opinion of counsel. (ECF No. 122 at 9, ¶¶ 17–18.) Defendants therefore argue that this evidence cannot be considered at summary judgment.

■ Defendants are mistaken. The proper evidentiary question at summary judgment is whether "a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). If Shapiro planned to rely entirely on previously undisclosed photographs, Defendants would have a stronger argument. However, the race and body type of the three NTU officers is something the jury may see for itself given that all three officers are listed (by both parties) on the Final Pretrial Order as potential witnesses. (*See* ECF No. 125 at 10–13.) Thus, the Court cannot say that facts about the NTU offi-

cers' race and build cannot be presented in a form that would be admissible in evidence. Given this, there is sufficient evidence from which a jury could conclude that Doane ordered the strip search, particularly if the jury accepts Rynek's story that he (Rynek) was elsewhere at the time.[4]

The more serious question raised by this identity dispute is whether Defendants' counsel face a non-waivable conflict of interest between their two clients. Rynek has an obvious incentive to point out that NTU officers conduct the strip searches of outgoing inmates (ECF No. 116 at 4, ¶ 13), thus implicitly pointing the finger at Doane. Doane generally agrees that NTU officers conduct the strip searches of outgoing inmates (ECF No. 120 at 13, ¶ 14), but he does not admit that he or any of his fellow NTU officers conducted the strip search in question—he does not take the position, for instance, that he *did* conduct a strip search but it was a *private* strip search and therefore constitutional. Instead, he apparently plans to deny all involvement, relying at least in part on "Shapiro's (mis)identification" of Rynek as evidence of his non-involvement. (ECF No. 122 at 19 n.10.) Thus, Doane is prepared to use evidence that inculpates Rynek to exculpate himself.

Counsel may believe that they can pursue a defense based on the idea that the evidence is so conflicting that the jury should entirely disbelieve Shapiro, or at least find that neither Rynek nor Doane was involved. This, however, would be a perilously thin line to tread. Counsel would in effect be required to give limiting in-

---

4. Defendants further object that the notion of "medium build" is "vague" and "so nondescript as to be useless." (ECF No. 122 at 8–9, ¶ 16.) The Court agrees that it is vague, but it is not so vague as to be useless. In common parlance, a medium build is a body type that tends to be close to what one perceives as the average body type in one's community. It is well within a jury's competence to make this judgment.

structions regarding their own evidence, *e.g.*—

- "Mr. Shapiro's attorneys want you to believe that Mr. Doane might have committed the strip search, but Mr. Shapiro himself fingered Mr. Rynek. Now, we don't believe that Mr. Rynek did it either, nor should you, but at the very least, there is good reason to believe that Mr. Doane was definitely not the man."

- "Mr. Shapiro fingered Mr. Rynek, but even Mr. Doane agrees that NTU officers are responsible for strip searching outgoing inmates. Now, that doesn't mean that you should presume that Mr. Doane performed the strip search, but at the very least, there is good reason to believe that Mr. Rynek was definitely not the man."

Having to perform such a high-wire act is a substantial sign that a conflict of interest exists. And the only way to avoid it would be to choose not to discuss the evidence that exculpates Rynek and Doane, respectively—which would itself be a violation of counsel's professional duties toward Rynek and Doane, respectively. *See* Colo. RPC 1.1, 1.7.

The Court does not have a comprehensive view of the evidence and arguments to be presented at trial. Therefore the Court cannot say with certainty that a non-waivable conflict of interest exists here. The Court nonetheless strongly encourages Defendants' counsel to seek an outside opinion on this matter at their earliest possible opportunity.

**C. Punitive Damages**

■ "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected

rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). Defendants argue that Shapiro has no evidence sufficient to satisfy this standard. (ECF No. 116 at 26.) Defendants' argument, however, is directed entirely at the objective circumstances that Defendants assumed to be true for summary judgment purposes: "a handful of males removing their clothing in the presence of one other male," which is allegedly "not dissimilar to that of 1000s of young men across the United States who daily participate in high school sports and must shower and dress in proximity to one another, or to that of adults who go to the gym." (*Id.*)

■ Whether or not this is a valid or relevant analogy, the objective circumstances of the strip search are not the proper inquiry. The proper inquiry, rather, is the defendant's subjective state of mind. Part of that inquiry may involve the defendant's subjective impressions *regarding* the objective circumstances (*e.g.*, "I did not think that making the inmates do something that I had to do in gym class was wrongful"). But neither Defendant's subjective impressions are in the record. Indeed, as noted, both Defendants deny involvement.

On this record, the Court cannot say that no reasonable jury could find the punitive damages standard satisfied. Notably, Defendants do not argue that Shapiro has no evidence from which a jury could infer a sufficiently culpable state of mind. Summary judgment is therefore inappropriate on this issue.

**D. Shapiro's Request for Partial Summary Judgment**

■ In his response brief, Shapiro argues that the Court should enter partial summary judgment in his favor as to liability, at which point "[t]he only two ques-

tions left to resolve in this case [would be] the identity of the state actor who ordered the strip search ... and what amount of damages Mr. Shapiro is entitled to." (ECF No. 120 at 2.) The Court rejects this request for multiple reasons.

First, it is procedurally improper. "A motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document." D.C.COLO.LCivR 7.1(d); *see also* WJM Revised Practice Standard III.B.

Second, summary judgment may not be granted in favor of a nonmovant unless the Court gives "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). This Court has never given such notice.

Third, Shapiro's request arises from the incorrect assumption that Defendants have conceded the group nature of the strip search. Defendants have only conceded that fact for summary judgment purposes. They intend to argue at trial that Shapiro was privately strip searched. (*See* ECF No. 116 at 7 n.1; ECF No. 122 at 2 n.1.)

Finally, even if Defendants had conceded the nature of the strip search for all purposes, the Court cannot enter a passive-voice summary judgment that Shapiro's rights "were violated." Those rights must have been violated, if at all, by some state actor. Here, the identity of that state actor is obviously in dispute. Moreover, if the jury finds that neither Rynek nor Doane conducted the search, the Court's abstract grant of summary judgment on liability would be meaningless.

Thus, Shapiro is not entitled to partial summary judgment in his favor.

## IV. CONCLUSION

For the reasons set forth above, Defendants's Motion for Summary Judgment (ECF No. 116) is DENIED. This matter REMAINS SET for a Final Trial Preparation Conference on February 3, 2017 at 4:00 p.m., and a 4-Day Jury Trial begin-

ning on Tuesday, February 21, 2017, both in Courtroom A801.