OSCN Found Document:Question Submitted by: The Honorable Michelle McCane, Oklahoma House of Representatives, District 72

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 Question Submitted by: The Honorable Michelle McCane, Oklahoma House of Representatives, District 72
2025 OK AG 12
Decided: 08/29/2025
OKLAHOMA ATTORNEY GENERAL OPINIONS
Cite as: 2025 OK AG 12, __ Repor __

 

¶0 This office has received your request for an Attorney General Opinion in which you ask, in effect, the following question:

May a public school district prohibit or otherwise restrict its employees from communicating directly with members of the district's board of education without violating the First Amendment of the U.S. Constitution or article II, section 22 of the Oklahoma Constitution?

I.

Summary

¶1 The Supreme Court's First Amendment jurisprudence likely forbids a blanket prohibition on school district personnel communicating directly with members of the district's school board. Whether a school district may prohibit or punish such communications turns on whether the employee spoke as a citizen on a matter of public concern, and if so, whether the employee's interest in commenting on such matters outweighs the interest of the school district, as an employer, in promoting effective and efficient public service. Any individual decision to discipline an employee for his or her speech to board members would be evaluated on a case-by-case basis, which falls outside the scope of an official Attorney General Opinion. See 74 O.S. § 18b

II.

Background

¶2 This request arose out of reports that employees of various school districts have been discouraged or even prohibited from raising concerns directly with school board members. That discouragement has led to questions about the rights of school district employees to communicate directly with school board members.

¶3 You ask about the implications of both the First Amendment of the U.S. Constitution and article II, section 22 of the Oklahoma Constitution. However, because the Oklahoma Supreme Court has not analyzed retaliation against a public employee for his or her speech under section 22, this opinion focuses only on the First Amendment. 

III.

Discussion

¶4 Prohibiting school district personnel from raising concerns directly to board members--or disciplining personnel for doing so--implicates the First Amendment. After all, "citizens do not surrender their First Amendment rights by accepting public employment." Lane v. Franks, 573 U.S. 228, 231 (2014). But the First Amendment's protections may sometimes coexist uneasily with the Government's rights as an employer, given the importance of providing efficient government services. When these interests collide, there is no one-size-fits-all rule. Instead, a court will analyze various factors, including the language of the school district's policy, the subject and setting, as well as the potential disruption caused by the employee's speech. 

A. When considering a prohibition of or punishment for a public employee's speech, courts balance the employee's interest in speaking on matters of public concern with the employer's interest in efficiently providing public services.

¶5 Speech on matters of public concern "lies at the heart of the First Amendment." Lane, 573 U.S. at 235. At the same time, the Supreme Court has recognized that government employers "need a significant degree of control over their employees' words and actions" to foster "the efficient provision of public services." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). The test the Court employs for balancing these interests is known as the Pickering test. In Pickering, a school district fired a high school teacher for writing a critical letter in the newspaper about his school board's and superintendent's handling of proposals to raise revenue for local schools. Pickering v. Bd. Of Educ., 391 U.S. 563, 564 (1968). The Court, first, held that the teacher's criticism "concern[ed] an issue of general public interest." Id. at 571. Next, the Court weighed the teacher's speech against the government's efficiency interests, and held that the criticism did not affect the teacher's "daily duties in the classroom" or "interfere[] with the regular operation of the schools generally." Id. at 572-73. Thus, the school district violated the First Amendment by firing the teacher. Id. at 575.

¶6 With this holding, Pickering--and cases that followed--created a two-step inquiry for judging whether a public employee's speech is protected under the First Amendment. The first step is to answer "whether the employee spoke as a citizen on a matter of public concern." Garcetti, 547 U.S. at 418. If not, there is no First Amendment protection. Id. If yes, a court must consider whether the government "had an adequate justification for treating the employee differently from any other member of the public." Id. While the government has some discretion in regulating speech as an employer, the restrictions "must be directed at speech that has some potential to affect the entity's operations." Id. The test defies bright-line rules and "has proved difficult" to apply. Id.

1. Did the employee speak, as a citizen, on a matter of public concern?

¶7 The first step is meant to protect against "constitutionaliz[ing] the employee grievance." Id. at 420. In determining whether an employee's speech survives the first step, courts consider two questions: (1) whether the employee spoke as a citizen or pursuant to his or her official duties, and (2) whether the speech involved a matter of public concern.

a. Speech as a citizen or as an employee.

¶8 "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens . . ., and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421. In Garcetti, for instance, a deputy district attorney raised concerns to his supervisors about the veracity of an affidavit and was later subject to alleged retaliatory employment actions. Id. at 413--15. The Court determined that the attorney's speech was "made pursuant to his duties as a calendar deputy[,]" which included "advis[ing] his supervisor about how best to proceed with a pending case." Id. at 421. Accordingly, the First Amendment did not protect his speech.

¶9 By contrast, some examples of communication outside the scope of an employee's job duties include: a director of a youth training program testifying in a federal prosecution of a former employee. Lane, 573 U.S. at 238; a teacher writing an op-ed on the use of public funds in his school district, and a public employee that discusses politics with a co-worker. Garcetti, 547 U.S. at 423. As these examples illustrate, speech can be outside the scope of an employee's job duties even if the speech contains information that was acquired by virtue of the employee's public employment. Lane, 573 U.S. at 240. The key aspect is whether the speech at issue is normally part of the employee's job duties. Thomas v. City of Blanchard, 548 F.3d 1317, 1324 (10th Cir. 2008).

b. Speech on a topic of public concern.

¶10 If the employee's speech was outside of the scope of the employee's duties, a court next considers whether the subject of the speech constituted a matter of public concern. If not, the speech will not be protected by the First Amendment. "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community' . . . or when it 'is a subject of legitimate news interest.'" Snyder v. Phelps, 562 U.S. 443, 453 (2011).

¶11 In Connick v. Myers, 461 U.S. 138, (1983), the Supreme Court considered a situation where an assistant district attorney--upset over her transfer to a different section--circulated a questionnaire to her fellow employees "concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." Id. at 140--141. The attorney's boss viewed the survey as insubordination and fired her. Id. at 141.

¶12 The Court determined that the survey was "most accurately characterized as an employee grievance concerning internal office policy" and not a matter of public concern. Id. at 154. The Court noted that the employee did not "seek to inform the public" that the District Attorney's office was not performing its duties or "seek to bring to light actual or potential wrongdoing." Id. at 148. If the questionnaire was released to the public, it "would convey no information at all other than the fact that a single employee is upset with the status quo." Id. The Court emphasized that the purpose of the questionnaire was "to gather ammunition" for the attorney's personal battle with her supervisors. Id. The only exception was the question about whether her fellow employees felt pressured to work for certain political campaigns because that question touched on a fundamental constitutional right to avoid coercion of beliefs. Id. at 149.

¶13 Applying these precedents, the Tenth Circuit held that a public defender's complaints to her supervisors alleging that unqualified people were placed in charge of the expert witness approval process involved matters of public concern. McFall v. Bednar, 407 F.3d 1081, 1089 (10th Cir. 2005). As the Tenth Circuit saw it, this speech implicated "the integrity and qualifications of public officials, the operations of government, and the right of a criminal defendant to effective assistance of counsel." Id. The Tenth Circuit has also determined that speech which discloses corruption, impropriety, malfeasance in government, or involves the expenditure of public funds is a matter of public concern. Conaway v. Smith, 853 F.2d 789, 796 (10th Cir. 1988); Glover v. Mabrey, 384 F.App'x 763, 769-70 (10th Cir. 2010).

¶14 In perhaps the most relevant case to your question, the Seventh Circuit reviewed a high school teacher's myriad complaints made directly to school board members regarding his school district. Ultimately, the court held that the teacher's complaints regarding his teacher evaluations and his classroom assignment were "personal matters"--not implicating public concern--while complaints about "inequitable mileage allowance for . . . coaches, liability insurance for coaches and volunteer parents, and the ineffectiveness of the grievance procedure" were all subjects of public concern. Knapp v. Whitaker, 757 F.2d 827, 840 (7th Cir. 1985). The latter topics were deemed to affect the school or community broadly.

¶15 From these cases, several guidelines emerge relevant to school district employees. Comments or complaints about an employee's particular employment situation, such as classroom reassignment, interpersonal issues with coworkers, or frustration with lack of advancement, are unlikely to be considered topics of public concern. Conversely, big picture complaints or criticisms of the school district are likely to be subjects of public concern. Examples would include concerns that the school district systematically is failing to educate special needs children or that a particular official mismanaged or embezzled public funds.

2. Does the employer's interest in the efficient provision of services outweigh the employee's interest in speaking on the issue?

¶16 The fact that speech involves a matter of public concern does not, by itself, guarantee First Amendment protection. Instead, the Court must balance the competing interests involved. As the Supreme Court put it, the task "is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 566. A citizen's interest in commenting freely on matters of public concern is straightforward. The government employer's interest is more varied. It can include the orderly operation of schools, as well as avoiding disruptions to the office, undermining of authority, and destruction of close working relationships. Connick, 461 U.S. at 154. In addition, the "manner, time, and place" of the speech is relevant to this inquiry. Id. at 152--53; see also Givhan v. W. Line Consolidated Sch. Dist., 439 U.S. 410, 415 (1979).

¶17 As an example, a teacher's decision to hijack a school assembly to expound on his or her views of the merits of discontinuing the penny is less likely to be protected than a teacher opining at a school board meeting that the school district should prioritize writing skills more within the curriculum. Similarly, a teacher confronting a school board member outside her home is less likely to be protected than a teacher who scheduled an appointment to meet with said board member. While the balancing can be straightforward in extreme hypotheticals, it can be difficult in the real world. Garcetti, 547 U.S. at 418. Again, the evaluation of any particular example would be fact dependent and beyond the scope of an AG opinion. 2023 OK AG 1474 O.S. § 18b

3. The Pickering balancing test applies to policies prohibiting a particular form of communication.

¶18 While the Pickering test is most often used in the context of individual instances of speech, the Supreme Court has also applied it to blanket prohibitions or restrictions on certain types of speech. Because such a restriction "chills potential speech before it happens[,]" the Court held that a blanket prohibition "gives rise to far more serious concerns than could any single supervisory decision." United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 457 (1995). Thus, the government's burden under the Pickering framework is greater when dealing with blanket prohibitions than it is when considering a solitary employment decision.

Applying the Pickering framework in this way, the Court struck down a federal law that "prohibit[ed] federal employees from accepting any compensation for making speeches or writing articles." Id. at 457. The Court held that most of the speech restricted by the law did not involve the subject matter of the government employment, which meant that the government was "unable to justify [the statute] on the grounds of immediate workplace disruption in Pickering and the cases that followed it." Id. at 470. The Court took the opposite view, however, when analyzing a federal law that prohibited federal employees from taking "an active part in political management or in political campaigns." U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, 413 U.S. 548, 550 (1973). In that case, the Court recognized that it was "fundamental" that federal employees administer the law as opposed to their own preferences or that of their political party, that it is "critical" that the government "appear[s] to the public to be avoiding [political justice][,]" and that advancement in government service should be based on merit as opposed to participation in party politics. Id. at 565--66. Therefore, the Court upheld the prohibition on federal employees engaging in political management or political campaign involvement.

B. A school district's blanket prohibition on its employees communicating directly with members of the district's board of education would likely violate the First Amendment.

¶19 Applying these precedents, a school district policy that flatly prohibits employees from communicating directly with the district's board of education would restrict a broad sweep of communication touching on matters of public concern. As such, the school district would face a higher burden to demonstrate that its interests as an employer outweigh the interests of the employee to speak as a citizen. Nat'l Treasury Emps. Union, 513 U.S. at 468.

¶20 In some ways, the school district would have a stronger interest than the federal government possessed in banning compensation for outside work. There, the Court held that "the vast majority of speech at issue . . . [did] not involve the subject matter of Government employment." Id. at 470. In this scenario, presumably many of the subjects a school district employee would want to talk to a board member about would involve the subject matter of employment. But it is unclear how the school district's efficient operations would be so seriously threatened by direct communication to justify a blanket prohibition.

¶21 This conclusion does not mean that a school district is powerless to restrict any communication by school employees to board members. Just as a state agency is allowed to limit the number of public comments at a meeting, so too can a school board limit the number of comments from employees at board meetings. See 1998 OK AG 45

¶22 Putting aside an official policy prohibiting all such direct communications, whether a school district may discipline an employee for particular instances of direct communication would depend on an application of the Pickering balancing test. If the speech involved the employee's official duties, it would not be protected under the First Amendment. For example, if part of an employee's job is to give a formal report to the school board, under Garcetti, speech contained within that report would not be protected. Next, even if the speech does not involve the employee's official duties, it still must relate to a subject of public concern to be afforded First Amendment protection. Examples of a public concern would include allegations of financial mismanagement within the school district and concerns over teaching methods. Speech that does not relate to a public concern includes the employee's personal grievances. Ultimately, whether speech on a public concern is protected by the First Amendment depends on whether the free speech interests outweigh the school district's interests in promoting the efficient delivery of public services.

¶23 It is, therefore, the official Opinion of the Attorney General that:

A school district's blanket prohibition on its employees communicating directly with school district board members likely violates the First Amendment. Whether a school district may take disciplinary action over a particular instance of communication would depend on a case-by-case balancing test.

Gentner Drummond
Attorney General of Oklahoma

Will Flanagan
Assistant Solicitor General

FOOTNOTES

See In re Initiative Petition No. 366, 2002 OK 2146 P.3d 123

2023 OK AG 14

Barker v. State Ins. Fund, 2001 OK 9440 P.3d 463Id. ¶ 16. To bring a wrongful discharge claim on this ground, a plaintiff "must first identify an Oklahoma public policy goal that is well established, clear and compelling and articulated in existing constitutional, statutory or jurisprudential law" and then prove that the employer's termination conflicted with that public policy. Id. Accordingly, it is possible that an internal whistleblower may successfully bring a wrongful discharge claim even though the whistleblowing speech was made pursuant to his or her employment duties--and thereby not protected by the First Amendment.

McFall was decided one year before the Supreme Court held that speech pursuant to employment duties was not protected under the First Amendment regardless of whether the subject was a matter of public concern. Garcetti, 547 U.S. at 421. Accordingly, it is possible that post-Garcetti the public defender's complaints would not be protected. But McFall's holding on whether the complaints implicated matters of public concern is still precedential.

 
 
 
 
 
 
 
 
 
 The Oklahoma Supreme Court
 2100 N. Lincoln Blvd., Suite 1
 Oklahoma City, OK 73105